[Cite as *State v. Roberts*, 2024-Ohio-1604.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-220615 |
| | | TRIAL NO. B-1904356 |
| Plaintiff-Appellee, | : | |
| | | *O P I N I O N.* |
| vs. | : | |
| ELIJAH BLAINE ROBERTS, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal From:  Hamilton County Court of Common Pleas

Judgment Appealed From Is:  Affirmed in Part, Reversed and Cause Remanded in
Part, and Appellant Discharged in Part

Date of Judgment Entry on Appeal: April 26, 2024

*Melissa A. Powers*, Hamilton County Prosecuting Attorney, and *Philip R. Cummings*,
Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Michael J. Trapp*, for Defendant-Appellant.

**KINSLEY, Judge.**

{¶1} Defendant-appellant Elijah Blaine Roberts appeals from the trial court's judgment convicting him of aggravated murder, aggravated robbery, tampering with evidence, and receiving stolen property in connection with the murder of his mother, Tracey Epperson. Roberts asserts six assignments of error, all of which relate to his convictions for aggravated murder, aggravated robbery, and tampering with evidence. He does not challenge his receiving stolen property conviction on appeal.

{¶2} Roberts argues that the trial court erred in denying his motion to suppress his statements in response to questioning during a roadside police encounter and in admitting evidence of his prior acts in Georgia in violation of Evid.R. 404(B). He also contends the trial court erred to his prejudice by convicting him of aggravated murder where there was no evidence of prior calculation and design. He further argues that his convictions for aggravated murder and aggravated robbery were not supported by sufficient evidence and against the manifest weight of the evidence. And he argues that his conviction for tampering with evidence was not supported by sufficient evidence.

{¶3} We sustain Roberts's first assignment of error and hold that the trial court erred in admitting statements made by him when he was in police custody but had not been given *Miranda* warnings. Excluding Roberts's statements, no direct evidence connected Roberts to the exact time of Epperson's murder. As a result, this error prejudiced Roberts and was not harmless as to his aggravated murder, aggravated robbery, and tampering with evidence convictions.

{¶4} We further hold that the trial court erroneously admitted evidence of Roberts's actions in Georgia under Evid.R. 404(B) and *State v. Hartman*, 161 Ohio St.3d 214, 2020-Ohio-440, 161 N.E.3d 651. We accordingly sustain Roberts's second assignment of error in part.

{¶5} We nonetheless overrule Roberts's third, fourth, and sixth assignments of error. When considering all evidence admitted at trial, including the evidence that was improperly admitted, Roberts's convictions for aggravated murder and aggravated robbery were supported by sufficient circumstantial evidence, and our holding with regard to the impermissible admission of Roberts's statements and the state's Evid.R. 404(B) evidence renders moot Roberts's manifest weight challenge. But we sustain Roberts's fifth assignment of error, because his conviction for tampering with evidence was not supported by sufficient evidence. We accordingly reverse Roberts's convictions for aggravated murder and aggravated robbery and remand the cause for a new trial, reverse his conviction for tampering with evidence and discharge him from future prosecution for that offense, and affirm his conviction for receiving stolen property.

### *Factual and Procedural Background*

{¶6} The charges against Roberts relate to the tragic death of his mother, Tracey Epperson, and Roberts's activities at his aunt's house in Georgia leading up to her death. On August 1, 2019, Epperson was found dead in her Cincinnati apartment during a wellness check by the police. One day prior, Roberts was questioned on a highway in Tipton County, Indiana, and arrested for providing false information to the police. Roberts was subsequently indicted in Hamilton County, Ohio, for one count of aggravated murder under R.C. 2903.01(A), one count of aggravated murder under

3

R.C. 2903.01(B), one count of aggravated robbery under R.C. 2911.01(A)(3), one count of tampering with evidence under R.C. 2921.12(A)(1), and one count of receiving stolen property under R.C. 2913.51(A). Though Roberts was initially found incompetent to stand trial, his competency was later restored.

### A. Suppression Hearing

**{¶7}** Roberts moved to suppress the statements he made in response to questioning by Tipton County and Cincinnati police officers as well as any evidence seized during the search of the car he was traveling in. The first statement Roberts challenged as being made in violation of his Fifth Amendment rights occurred during the sixteenth minute of the traffic stop.

**{¶8}** The trial court held a suppression hearing on March 17, 2021. At the suppression hearing, Officer Whitney Jordan Lushin, a former deputy with the Tipton County Sheriff's Office, testified. Lushin's body-worn camera footage was also played at the suppression hearing. Lushin testified that on July 31, 2019, he observed a disabled Honda CRV on the side of a two-lane highway in Tipton County, which prompted him to conduct what he called a welfare check.

**{¶9}** Lushin testified that the car was parked past the fog line of the highway, meaning that it was protruding into the roadway. But in the footage from Lushin's body-worn camera, it is clear that Roberts's car was pulled over behind the fog line and was completely out of the way of traffic. Lushin's body-worn camera footage showed him questioning Roberts as to why he pulled over. Roberts responded that he was connecting his phone to the car's Bluetooth. Lushin testified that Roberts appeared visibly nervous, with shaking hands and a trembling voice.

{¶10} Lushin further testified that when he asked Roberts for identification, Roberts identified himself as "Eli Blaine" but struggled to provide his birthdate. Lushin then ordered Roberts to exit from the car and come to the front of his police car. Specifically, Lushin demanded that Roberts "put his butt on the Ford symbol [of the police car]." Lushin testified that Roberts then admitted he was not being completely honest regarding his identity, because he had not adjusted to a recent name change. Roberts eventually identified himself as "Elijah Blaine Roberts" and provided a birthdate.

{¶11} At this point in his body-worn camera footage, Lushin began repeatedly asking Roberts why he was being dishonest. He also informed Roberts that lying to a police officer was a crime in Indiana. He further asked Roberts if he had drugs in the car, if Roberts was a missing person, and if Roberts had committed murder in Ohio. He then checked Roberts's pockets before asking him to take a seat inside his police car with him. While inside his police car with Roberts, Lushin ran searches on the information Roberts provided him. Lushin testified that he learned Epperson, not Roberts, was the owner of the Honda CRV and that Roberts's license was suspended.

{¶12} Lushin then ordered Roberts to get out of the police car and "put [his] butt right there [on the police car]." He asked Roberts for his mother's name, which confirmed that Epperson was his mother. When he asked Roberts whether his mother knew that he was driving her Honda CRV, Roberts responded that he had her permission to use the car. He also informed Roberts that a canine unit was on its way, but did not explain why or what the canine might be attempting to locate.

{¶13} Lushin testified that although Roberts denied consent to search the car, Roberts allowed Lushin to retrieve his phone from the car so that Lushin could contact

Epperson. He further testified that he saw a woman's pocketbook in the center console of the car when he went to retrieve Roberts's phone. He also testified that when he gave Roberts his cellphone to call Epperson, he realized that Roberts dialed Epperson's number, because he did not have any contacts saved. Roberts told Lushin that he had recently reset his cellphone. Epperson did not answer Roberts's call.

{¶14} Lushin questioned Roberts regarding the woman's pocketbook in the center console. Roberts confirmed that the pocketbook was Epperson's and that she had left it in the center console when unloading groceries. Lushin again accused Roberts of lying and changing his story. At this point, the canine unit arrived and conducted a search of the car. After the search, Roberts was put under arrest and taken to the Tipton County Jail. Roberts was not given *Miranda* warnings at any point during this encounter.

{¶15} Lushin testified that although he initially took Roberts to an advocacy center for victims of abuse due to his odd behavior, he eventually received a call from the Cincinnati Police Department notifying him that Roberts was suspected of homicide in Cincinnati.

{¶16} Lushin testified that his encounter with Roberts occurred in daylight. He further testified that he did not believe Roberts was able to leave or walk away during the encounter. He also testified that Roberts had not committed a traffic violation and before he even asked Roberts for identification and began interrogating him, he determined there was no mechanical or medical problem. He testified that although he had no reason to believe there were drugs inside the car, he requested a canine unit, because he had reasonable suspicion to believe there was evidence of

criminal activity inside the vehicle. Lushin also testified at trial to his roadside encounter with Roberts.

{¶17} Detective Kimberly Kelley of the Cincinnati Police Department also testified at the suppression hearing. She testified that she became involved when Epperson's sister requested a wellness check for Epperson. After Epperson was found dead in her apartment, Kelley notified Epperson's sister, who told her that Epperson had been trying to locate her son. Kelley testified that she then learned from the Tipton County Sheriff's Department that Roberts had been found with Epperson's car.

{¶18} Kelley testified that she and her partner, Detective Kurt Ballman, went to the Tipton County Jail to interview Roberts. She testified that after explaining to Roberts why he was being questioned, he was given *Miranda* warnings. Roberts then signed a form acknowledging his understanding of the *Miranda* warnings and eventually requested an attorney.

{¶19} The trial court considered Roberts's motion to suppress in the context of his statements to Lushin during the traffic stop. It found that the roadside intrusion was minimal and that Roberts was not under arrest until nearly 44 minutes into the encounter. The trial court therefore granted Roberts's motion to suppress in part and concluded that any statements made by Roberts after his arrest were inadmissible, because he should have been given *Miranda* warnings at that point. Further, the trial court found that Roberts did not have standing to challenge the search of the car. Lastly, the trial court found that because Roberts was given *Miranda* warnings before Kelley and Ballman began questioning him and Roberts requested an attorney during questioning, there was no coercive police conduct which warranted suppressing any statements made to Kelley and Ballman.

### B. Motions in Limine

**{¶20}** Roberts also moved to exclude a statement made by Lushin that Roberts was acting as if he had just killed his mother and evidence of his actions in Georgia, including taking his aunt's Honda Pilot without her permission and her observation of smoldering curtains in her dining room soon after his departure.

**{¶21}** The trial court granted Roberts's motion to exclude Lushin's statement. The trial court also heard argument as to the admissibility of evidence of Roberts's actions in Georgia. The state argued these acts were admissible under Evid.R. 404(B), because they were probative of Roberts's intent. Roberts countered that because he was not arguing Epperson's death was a mistake, intent was not at issue, and the state could not rely on that permitted use under Evid.R. 404(B).

**{¶22}** The trial court found that the probative value of this evidence outweighed any prejudicial effect and that it was admissible for purposes of proving intent, motive, preparation, and plan under Evid.R. 404(B). Further, the trial court noted that it would provide a limiting instruction to the jury as to this evidence.

### C. Trial

**{¶23}** The case proceeded to a jury trial on September 20, 2022. Prior to trial, Roberts waived his right to a jury trial as to the receipt of stolen property charge and elected to try this count to the court. In contrast to the aggravated murder, aggravated robbery, and tampering with evidence charges, which arose from Epperson's death, the receiving stolen property charge related to Roberts's alleged theft of his paternal aunt Regina Williams's car.

**{¶24}** Williams testified at trial that in June 2019, Roberts moved into her home in Augusta, Georgia, because he was experiencing difficulties after coming out

to his family. She testified that Roberts had a loving relationship with Epperson and that prior to her death, Epperson was paying Roberts's phone bill and rent, as well as sending him money every week. She further testified that around the time of Epperson's death, Roberts began acting strangely and she noticed him talking to himself.

{¶25} About six weeks after Roberts moved in, Williams saw Roberts drive away with her Honda Pilot without her permission. Roberts did not return after this incident, and Williams notified Epperson. When Williams testified to the details of Roberts's abrupt departure, Roberts objected to the state eliciting any testimony regarding his actions in Georgia. The trial court provided a limiting instruction to the jury that they were only to consider this testimony for the limited purposes of showing Roberts's intent, motive, plan, or preparation. Specifically, during Williams's testimony, the trial court instructed the jury that as to Roberts's alleged theft of Williams's Honda Pilot:

> And ladies and gentleman of the jury, Ms. Williams is going to describe some events in Georgia. So any act that she describes in regard to the events in Augusta, Georgia, as being admitted for * * * some limited purposes here, those limited purposes include showing the Defendant's intent, motive, plan, or preparation. And just because the Defendant may have committed some act in Georgia, you should not conclude or infer just because he committed some violent act or some bad act in Georgia that he necessarily committed some bad act or acted consistent with that character in committing some bad act in Cincinnati, Ohio.

In other words, do not infer any character for violence based on the events that Ms. Williams is going to describe in Augusta, Georgia, in regard to this car, and I will instruct you further on that when you get the jury instructions what you are to consider that evidence for.

**{¶26}** Williams also testified that on the day that Roberts left, she noticed the curtains in her dining room were smoldering. But she testified that she did not actually see any smoke or fire and that she was unsure if her smoke alarms were working at that time. She testified that she called the police regarding the theft and potential fire but did not press charges.

**{¶27}** In the absence of the jury, Roberts moved to strike Williams's testimony regarding the smoldering curtains and smoke alarms in her dining room. Although the trial court acknowledged that there was no probative value to this testimony, it did not strike the testimony. The trial court, however, cautioned the state that this testimony was not probative of Roberts's intent or motive. It did not instruct the jury as to how it should consider this evidence at the time of Williams's testimony.

**{¶28}** Officer Zachary Kress of the Cincinnati Police Department also testified. Kress indicated that on July 31, 2019, he went to Epperson's apartment to conduct a wellness check in response to 911 calls for her safety, but no one answered. In addition, Sergeant Andrew Snape of the Cincinnati Police Department, who was also called as a witness, testified that after he was dispatched to Epperson's apartment on August 1, 2019, he discovered that her car was not in the parking lot. He further testified that he found Epperson deceased by the front door of her apartment with a grocery bag over her head and a purse strap around her neck, lying next to bagged groceries and a broken chair. He testified that it looked as though the dining table had been moved

from its normal position. Kurt Baker of the Cincinnati Fire Department also testified. He testified that when he arrived on the scene, he concluded from Epperson's physical condition that she had been deceased for at least three hours.

{¶29} Officer Jennifer Lane, a criminalist with the Cincinnati Police Department, testified that in processing the crime scene at Epperson's apartment, she found a purse on the kitchen table which matched the strap around Epperson's neck, a note evidencing Epperson's failed efforts to track Roberts's cellphone, and a Jimmy John's receipt from July 31, 2019. Williams's Honda Pilot was found parked near Epperson's apartment, with Roberts's debit card along with several receipts in the center console. Lane took DNA swabs of Epperson's front door, kitchen cabinet, back sliding door, a box of trash bags, the plastic bag on Epperson's head, and the purse strap. Officer Jimmy Nghia Duk Pham, also a criminalist with the Cincinnati Police Department, testified that a Kroger receipt from July 31, 2019, was found in the Honda CRV Roberts was driving and Epperson's apartment keys were found in Roberts's backpack.

{¶30} Dr. Jennifer Schott, a deputy coroner and forensic pathologist with the Hamilton County Coroner's Office, testified that Epperson's cause of death was strangulation and the manner of death was homicide. Dr. Schott testified that Epperson's fingernail clippings were taken, because there could have been DNA from her attacker under her nails. But she was unsure if the fingernail clippings were ever tested.

{¶31} William Ralph Harry, a forensic scientist with the Hamilton County Coroner's crime lab, testified as to the results of DNA testing of swabs taken from Epperson's apartment and Williams's Honda Pilot. Roberts's DNA matched the DNA

swabs taken from the Honda Pilot, but not the plastic bag found over Epperson's head, the box of trash bags, or the interior doorknob of Epperson's apartment. The remaining DNA swabs contained the DNA of two different individuals, including Epperson. But the second individual's DNA was present in such small quantities that the person's identity could not be ascertained.

{¶32} Kelley also testified at trial, but her trial testimony related to the physical evidence tracing Roberts's and Epperson's locations on July 31, 2019. She testified that Epperson's ID and credit cards were found in the wallet recovered from the Honda CRV Roberts was driving, which confirmed the wallet belonged to Epperson. She testified that receipts recovered from the Honda CRV confirmed that Roberts had been in South Carolina in the early morning of July 30, 2019, and in North Carolina in the late evening of July 30, 2019. And she testified that a receipt and video footage from a McDonald's near Epperson's apartment confirmed that Roberts was in Cincinnati in the late evening of July 31, 2019.

{¶33} Kelley also testified that video footage from Kroger confirmed that Epperson was wearing the same clothes in Kroger that she was later wearing when she was found to be deceased. She further testified that it was significant that Roberts was not in the video footage from Kroger, because he told Lushin that he had accompanied his mother to Kroger. She indicated that the Jimmy John's receipt found in Epperson's apartment confirmed that Epperson went there right after going to Kroger and that Epperson purchased only one sandwich. And she testified that Epperson's personal notes found in her apartment, which were dated the morning of July 31, 2019, indicated that Epperson had been trying to locate Roberts by calling jails and hospitals.

{¶34} At the close of the state's case, Roberts made a Crim.R. 29 motion for acquittal, which the trial court denied. When Roberts later renewed his motion, the trial court denied it again.

{¶35} The trial court also heard argument regarding jury instructions as to Evid.R. 404(B). Though Roberts maintained that intent was not at issue, the trial court included a limiting instruction as to intent, motive, and preparation. In its final instructions to the jury, the trial court omitted language it had previously included allowing the jury to consider Williams's testimony for the purpose of Roberts's plan. Over objection, the trial court's final jury instruction as to Roberts's activities in Georgia was worded as follows:

> Testimony was received about the commission of the act of taking Regina Williams's vehicle. That evidence was received only for a limited purpose. It was not received, and you may not consider it, to prove the character of the Defendant in order to show that he acted in conformity with that character. If you find that the evidence of the theft of Regina Williams's vehicle is true and the Defendant committed it, you may consider that evidence only for the purpose of deciding whether it proves the Defendant's motive, intent, or preparation, and that evidence cannot be considered for any other purpose.

{¶36} The jury found Roberts guilty as charged of aggravated murder, aggravated robbery, and tampering with evidence. During sentencing, the trial court also found Roberts guilty of the remaining count of receiving stolen property and sentenced him to life imprisonment with parole eligibility after 25 years.

{¶37} Roberts now appeals.

### *Custodial Interrogation*

**{¶38}** In his first assignment of error, Roberts argues the trial court erred in denying his motion to suppress certain statements he made in response to Lushin's roadside questioning. The statements Roberts challenged began about 16 minutes into his encounter with Lushin. Roberts was not Mirandized at any point in the encounter. Though the trial court found Roberts was not in custody until nearly 44 minutes into his encounter with Lushin, Roberts contends a reasonable person would have believed he or she was in custody much sooner than that.

**{¶39}** Roberts therefore argues that the admission of certain statements he made after the sixteenth minute violated his rights under the Fifth Amendment to the United State Constitution and Article 1, Section 10 of the Ohio Constitution. Specifically, Roberts challenges the admissibility of his statements to Lushin that Epperson gave him permission to use her car and knew where he was headed, that he was present when Epperson was unloading groceries, and that he had recently reset his phone. These statements were made before the trial court held Roberts to be in custody for purposes of *Miranda*. *See Miranda v. Arizona*, 384 U.S. 436, 865 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Thus, the question on appeal is whether Roberts was in custody at the time he made the challenged statements.

**{¶40}** "Appellate review of a motion to suppress presents a mixed question of law and fact." *State v. Montgomery*, 1st Dist. Hamilton No. C-220063, 2022-Ohio-4030, ¶ 15, citing *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. "We must accept the trial court's factual findings if they are supported by competent, credible evidence, but we review de novo the trial court's application of the law to those facts." *Id.*

{¶41} In *City of Cleveland v. Oles*, the Ohio Supreme Court outlined the parameters of *Miranda* warnings:

> In *Miranda v. Arizona*, the United States Supreme Court established procedural safeguards for securing the privileges against self-incrimination guaranteed by the Fifth Amendment to the United States Constitution. The Fourteenth Amendment to the United States Constitution makes the privilege against self-incrimination applicable to a witness in a state proceeding.

> What are commonly known as *Miranda* warnings are intended to protect a suspect from coercive pressure present during a custodial interrogation. A custodial interrogation is questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. If a suspect provides responses while in custody without having first been informed of his or her *Miranda* rights, the responses may not be admitted at trial as evidence of guilt.

(Internal quotation marks and citations omitted.) *City of Cleveland v. Oles*, 152 Ohio St.3d 1, 2017-Ohio-5834, 92 N.E.3d 810, ¶ 8-9.

{¶42} Further, the court explained that determining whether front-seat questioning during a traffic stop is a custodial interrogation requires a fact-specific inquiry, which asks whether a reasonable person in the suspect's position would have understood himself or herself to be in custody while being questioned. *Id*. at 21. The court also clarified that the relevant test is not whether a reasonable person would not have been free to leave. *Id*. at ¶ 30. The court identified the invasiveness, length, and

intimidation level of the interaction as factors which may provide guidance in this fact-specific inquiry. *Id.* at ¶ 24. Ohio appellate courts have also considered additional factors such as the location and time of day of the questioning, restrictions to the defendant's freedom of movement, any verbal or physical threats made against the defendant, and coercive tactics used by the police. *Montgomery*, 1st Dist. Hamilton No. C-220063, 2022-Ohio-4030, at ¶ 21. Thus, we consider the defendant's freedom of movement as a non-dispositive factor.

**{¶43}** But "[t]he law of *Miranda* has no application to purely voluntary statements which are not the result of express questioning or its functional equivalent." (Internal quotation marks omitted.) *State v. Wigle*, 9th Dist. Summit No. 25593, 2011-Ohio-6239, ¶ 31. Rather, "[i]t is the premise of *Miranda* that the danger of coercion results from the interaction of custody and official interrogation." *Id.*

**{¶44}** For example, in *State v. Watts*, the defendant was identified as a potential witness in a murder case and volunteered to be interviewed by the police. *State v. Watts*, 12th Dist. Butler No. CA2005-08-364, 2007-Ohio-221, ¶ 2-4. Though the defendant initially was briefly handcuffed, the officers apologized to the defendant for any inconvenience. *Id.* at ¶ 4. During the interview, the officers determined the defendant was a suspect and provided *Miranda* warnings. *Id.* Because the court concluded that the defendant's statements were voluntary and that a reasonable person in his position would not have believed his or her freedom of movement was being restrained, the court held that the trial court did not err in overruling the defendant's motion to suppress his statements. *Id.* at ¶ 17-18.

**{¶45}** Conversely, in *State v. Farris*, the Ohio Supreme Court held that the officer's treatment of the defendant placed him in custody for practical purposes, when

the officer patted down the defendant, took his keys, instructed him to enter the police cruiser, and told the defendant his car was going to be searched due to the scent of marijuana. *State v. Farris*, 109 Ohio St.3d 519, 2006-Ohio-3255, 849 N.E.2d 985, ¶ 14. The court reasoned that the defendant was not free to leave the scene and that he reasonably believed he would be detained at least as long as it would take for the officer to search his car. *Id.*

{¶46} Turning to Roberts's case, we note that the facts of what took place during the roadside encounter between Roberts and Lushin are not in dispute, as the event was captured on Lushin's body-worn camera. Thus, we view the question as to whether the trial court erred in failing to suppress statements made by Roberts that began during the first 16 minutes of the encounter as one of law that we review de novo. *See Montgomery*, 1st Dist. Hamilton No. C-220063, 2022-Ohio-4030, at ¶ 15. We resolve this legal question by asking whether a reasonable person in Roberts's position would have understood himself to be in custody at the 15:59 minute mark of his encounter with Lushin, as that was the point in time at which Roberts was questioned in a way that he contends violated the Fifth Amendment.

{¶47} We begin by considering Lushin's control of Roberts's movement, a factor which strongly weighs in favor of a finding that Roberts was in custody by the sixteenth minute of the traffic stop. Lushin first began exerting control over Roberts's freedom of movement around three minutes into the traffic stop by ordering Roberts to get out of his own car and to "put his butt" on the front of Lushin's police car. While Roberts was on the front of the police car, Lushin further instructed Roberts not to put his hands in his pockets. Thereafter, Lushin ordered Roberts off of the hood and into the police car, patting him down before he entered the car. And he again ordered

Roberts out of the police car and back onto the front of it, further using a directive to "put [his] butt right there." Then, Lushin informed Roberts that he had called for a canine unit to search Roberts's car. All of this occurred before Roberts offered the challenged statements in response to Lushin's questions.

{¶48} These dynamics would have led a reasonable person to understand himself to be in custody. Within the span of less than 11 minutes—from the three-minute mark when Lushin first ordered Roberts out of his own car and onto the front of the police car to the 13:21 mark when Lushin ordered Roberts out of the police car and back onto the hood—Lushin demanded that Roberts change his location three times and further restricted his ability to freely move his body by prohibiting him from putting his hands in his pockets. Critically, Lushin's directives removed Roberts from his own vehicle—the means by which he could have left the scene—and placed him in close contact with Lushin's police car, the vehicle used to transport individuals charged with crimes. Lushin's instructions to Roberts therefore removed Roberts from an environment of physical freedom and placed him in a space associated with arrest.

{¶49} Furthermore, Lushin's language was coercive and direct. Lushin repeatedly gave Roberts the appearance of the authority to control Roberts's movement. For example, on more than one occasion, Lushin described a specific part of Roberts's body and the location where Roberts needed to move. No reasonable person, having been ordered by a police officer out of his own vehicle and onto and inside of a police car by an officer using terms like "butt," would feel free to simply walk or drive away. Lushin also required Roberts to remain on scene while a canine

unit was ordered to investigate Roberts's car. This, too, would have heightened the coercion Roberts experienced.

{¶50} And, even more importantly, Lushin accused Roberts of committing a crime by lying to him just a few minutes into their encounter. Specifically, Lushin told Roberts that lying to a police officer was a crime in Indiana, where their encounter took place. Thus, a reasonable person in Roberts's position would understand himself to be in custody because a police officer with the authority and power to arrest him had just accused him of committing a criminal offense.

{¶51} The invasiveness and level of intimidation of Lushin's statements to Roberts further support the conclusion that Roberts was in custody at the time he began making the challenged statements. Even though Lushin testified that he quickly confirmed that Roberts had not committed a traffic violation and that there was no medical or mechanical problem that required his assistance, Lushin continuously badgered Roberts about his seemingly nervous demeanor and dishonest responses. Within the first 16 minutes, Lushin asked Roberts about activities far exceeding Roberts's reason for pulling the car over to the side of the road. In addition to informing Roberts that lying to police was a crime, Lushin asked whether Roberts was lying numerous times, inquired as to why he was nervous, asked if there were drugs in the car, insinuated Roberts had committed a murder, and informed him that his driver's license was suspended. This line of questioning was clearly accusatory and would have led a reasonable person to believe the police suspected him of a crime. The fact that Lushin's questions were pointed, invasive, and intimidating would only heighten the feeling of being under arrest that a reasonable person would already have as a result of the restrictions Lushin placed on Roberts's movement.

{¶52} Moreover, Lushin informed Roberts that a canine unit was on its way to search Roberts's car. Like in *Farris*, where the defendant could have reasonably believed he would be detained at least as long as it took for the officer to search his car, Roberts similarly would have understood himself to be in custody at least until the canine unit finished its search. *See Farris*, 109 Ohio St.3d 519, 2006-Ohio-3255, 849 N.E.2d 985, at ¶ 14.

{¶53} The location of the interaction also informs its custodial nature. For example, a defendant in a more comfortable environment, such as his home, may feel less restricted than in a police station. *State v. Knight*, 2d Dist. Montgomery No. 24130, 2011-Ohio-3284, ¶ 16. Here, Roberts was ordered to get out of the car he was traveling in and sit on the hood of a police car on the side of a rural highway. The location therefore lent itself to a slightly more custodial interaction, although we interpret this factor as weighing more neutrally than the others in terms of its impact on Roberts's understanding of whether he was in custody.

{¶54} Lushin attempted to explain at the suppression hearing why he so expansively questioned Roberts by pointing to Roberts's trembling hands and avoidance of eye contact. But determining whether this interaction was a custodial interrogation does not hinge on Lushin's perception of the situation. The relevant inquiry is whether a reasonable person in Roberts's position would have understood himself or herself to be in custody, not whether Lushin validly viewed the situation as a welfare check. *See Oles*, 152 Ohio St.3d 1, 2017-Ohio-5834, 92 N.E.3d 810, at ¶ 30. In other words, the question is not whether Lushin had a reasonable basis for asking the questions he asked, but whether, as a matter of law, a reasonable person in Roberts's position would have perceived those questions as indicia that he was in

custody. We believe a reasonable person would have drawn that conclusion given the totality of the circumstances Roberts faced.

{¶55} Considering the full dynamics of the first 16 minutes of the encounter, including Lushin's coercive and accusatory roadside questioning of Roberts, the restrictions Lushin placed on Roberts's freedom of movement, the location of the encounter, and the threat of a canine search, the intrusion into Roberts's freedom to leave the scene was not minimal. A reasonable person in Roberts's position would have understood himself to be in custody by the sixteenth minute of the encounter when Roberts began making the challenged statements. *See id.* By that point in time, Lushin's roadside questioning of Roberts and escalating show of authority undoubtedly exerted pressure that sufficiently impaired Roberts's free exercise of his privilege against self-incrimination and required that he be warned of his constitutional rights. *See id.* at ¶ 31.

{¶56} Therefore, we hold that because Roberts was in custody for practical purposes at the 15:59 mark of Lushin's body-worn camera footage when Roberts made the first challenged statement and was never given *Miranda* warnings, any statements Roberts made in this footage after this time stamp were inadmissible at trial.

{¶57} Our inquiry, however, does not end here. Having determined that Roberts's statements after the 15:59-minute mark of his encounter with Lushin were inadmissible under the Fifth Amendment, we must assess whether introduction of those statements at trial amounted to harmless error. *State v. Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, 9 N.E.3d 930, ¶ 122-123. This standard questions whether there remains evidence beyond a reasonable doubt of the defendant's guilt if the

offending evidence is excised. *State v. Morris*, 141 Ohio St.3d 399, 2014-Ohio-5052, 24 N.E.3d 1153, ¶ 33.

{¶58} Having reviewed the record in this case, we cannot say that Roberts would have inevitably been convicted of aggravated murder, aggravated robbery, and tampering with evidence without the introduction of his statements to Lushin. It is true that the state demonstrated through other evidence that Roberts had been to a nearby McDonald's around the time of Epperson's murder and had parked Williams's Honda Pilot near his mother's apartment. Roberts was also found in possession of Epperson's wallet and keys and was driving her car. But these facts do not convincingly establish that Roberts would have inevitably been convicted of her murder beyond a reasonable doubt, particularly given Roberts's familial relationship to his mother and the lack of testimony that he would not have had access to her belongings. In weighing whether a conviction would have resulted without the introduction of Roberts's statements, we are also mindful that another person's DNA was found in Epperson's apartment, but in too little quantity to effectively test, and that police were in possession of Epperson's fingernail clippings that were never tested for the attacker's DNA.

{¶59} With regard to the aggravated robbery charge, similar concerns exist after excising Roberts's statements from the available evidence to consider. While Roberts was found in possession of Epperson's property, the record contains very little circumstantial evidence as to whether Roberts obtained the property by force or consent, without his statements to Lushin. And this lack of evidence is fatal to the notion that the state proved Roberts's guilt beyond a reasonable doubt had his statements to Lushin not been introduced to the jury.

{¶60} Lastly, with regard to the tampering with evidence charge, we hold later in this opinion that the state presented insufficient evidence, even including Roberts's statements, to support Roberts's conviction. Thus, for reasons we explain below, Roberts's conviction for evidence tampering would not have been inevitable in the absence of his statements, given that the evidence as a whole was not sufficient to justify his conviction.

{¶61} Thus, in sum, we find that the trial court's error in admitting Roberts's statements to Lushin after he was in custody but before he was given *Miranda* warnings was not harmless as to Roberts's aggravated murder, aggravated robbery, and tampering with evidence convictions. We accordingly sustain Roberts's first assignment of error on this basis.

### Evid.R. 404(B)

{¶62} Roberts's second assignment of error challenges the trial court's admission of evidence of his actions in Georgia under Evid.R. 404(B) for the purpose of proving intent, motive, and preparation. Roberts argues the trial court improperly admitted evidence that he stole Williams's Honda Pilot and purse in Georgia and that Williams had observed her dining room curtains smoldering around the time of his departure. Specifically, Roberts argues that intent was not at issue, that the theft in Georgia did not make the murder in Cincinnati more or less likely, and that the murder was a sudden act that required no preparation.

{¶63} Before addressing Roberts's argument under Evid.R. 404(B), we address two preliminary matters. First, we note that Roberts does not challenge the introduction of Williams's testimony that Roberts took her vehicle without consent as that testimony relates to his conviction for receiving stolen property, a count that was

severed from the charges being tried to the jury and tried instead to the trial court. Our discussion of Evid.R. 404(B) therefore relates solely to evidence heard by the jury and its impact on the jury's verdict as to the aggravated murder, aggravated robbery, and tampering with evidence charges.

**{¶64}** Second, we can easily dispense with Roberts's Evid.R. 404(B) claim regarding Williams's purse. Williams testified that she saw Roberts drive away with her Honda Pilot, but her testimony as to her purse was limited to her observation that it was missing. Further, when criminalists processed the Honda Pilot, a black suitcase and bag were found inside, but no one testified that these belonged to Williams. While, in theory, the state could have advanced some connection between Williams's missing purse in Georgia and Epperson's purse being used as the murder weapon in Ohio, the prosecution never argued any such connection, either in its opening or closing statements or through its questioning of witnesses. And in the jury instructions, the trial court noted that Roberts taking Williams's Honda Pilot could be considered for the purpose of proving intent, motive, and preparation, but it did not mention Williams's purse. Thus, given the lack of either testimony or argument insinuating that Roberts stole Williams's purse, we find that the mere mention by Williams of a missing purse does not allege an "other act" by Roberts sufficient to trigger Evid.R. 404(B).

**{¶65}** But both Williams and the state did allege that Roberts committed other acts in Georgia, including taking Williams's Honda Pilot and causing her dining room curtains to smolder. We therefore consider whether this evidence was properly admitted under Evid.R. 404(B).

24

{¶66} Evid.R. 404(B)(1) provides that, "Evidence of any other crime, wrong or act is not admissible to prove the person's character in order show that on a particular occasion the person acted in accordance with the character." But under Evid.R. 404(B)(2), other-acts evidence may be admitted for the purpose of proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. In *State v. Hartman*, 161 Ohio St.3d 214, 2020-Ohio-4440, 161 N.E.3d 651, the Ohio Supreme Court provided a detailed framework for considering the admissibility of other-acts evidence under Evid.R. 404(B).

{¶67} At step one, the court must require the proponent of the evidence to identify a specific purpose from those enumerated in Evid.R. 404(B) for which the evidence is being admitted and then assess the relevance of the proffered evidence to that purpose. *Id*. at ¶ 26. At this juncture, trial courts should look to the materiality of the nonpropensity purpose for which the evidence is being introduced and must ensure that there is sufficient reason to believe the defendant actually committed the other wrongful act. *Id*. at ¶ 27-28. We review errors at step one de novo. *Id*. at ¶ 22.

{¶68} Assuming that test is met, at step two, trial courts must turn to Evid.R. 403(A) and weigh the prejudicial impact of admitting the evidence against its probative value to make a final determination as to whether the evidence comes in at trial. *Id*. at ¶ 29. This weighing process should be "robust" and should take into account the human predisposition to more heavily emphasize a record of wrongful acts in judging whether a new crime occurred. *Id*. Where the proponent of the evidence seeks to introduce it to prove an issue that is not actually in dispute at trial, the probative value of the evidence will be very slight, and thus the risk of prejudice is high. *Id*. at ¶ 31. We review errors at step two for an abuse of discretion. *Id*. at ¶ 30.

**{¶69}** If the evidence meets these threshold inquiries, trial courts admitting evidence of a defendant's other wrongful conduct under Evid.R. 404(B) should issue a carefully worded instruction that limits the jury's consideration of the evidence to the stated purpose for which it is admitted. *Hartman*, 161 Ohio St.3d 214, 2020-Ohio-4440, 161 N.E.3d 651, at ¶ 34, 66. The instruction must be tailored to the facts of the case and should "explain, in plain language, the purposes for which the other acts may and may not be considered." *Id.* at ¶ 70-71. Where the defendant requests the instruction, courts must give it. *Id.* at ¶ 67.

**{¶70}** We consider each purpose offered for this evidence in turn below.

### *A. Intent*

**{¶71}** "Intent is an element of most crimes, but it typically is not a material issue for other-acts purposes unless it is genuinely disputed—in most cases, the act speaks for itself." *Id.* at ¶ 55. "Thus, intent evidence is not admissible when the requisite intent is presumed or inferred from proof of the criminal act itself, or when intent is not in issue at all, such as when the defense theory is that the act never occurred at all." *Id.*

**{¶72}** In *Hartman*, the Ohio Supreme Court cited *State v. Brogan*, 272 Mont. 156, 900 P.2d 284 (1995), to explain these principles. *Hartman*, 161 Ohio St.3d 214, 2020-Ohio-4440, 161 N.E.3d 651, at ¶ 56. There, the defendant was charged with unlawfully possessing wild elk and, as a defense, argued the elk had inadvertently wandered onto his property. *Brogan* at 159. In response, the state of Montana presented evidence of a prior criminal case where the defendant had failed to maintain his fence and subsequently captured the elk that ventured onto his property. *Id.* at 165. The Ohio Supreme Court highlighted that the prior criminal case was "admissible

26

*not* to show that the defendant had the propensity to capture elk but to negate his explanation for how the elk came to be on his farm." (Emphasis added.) *Hartman* at ¶ 56. Evidence of the defendant's intent was therefore admissible under Evid.R. 404(B) to negate a defense of mistake.

**{¶73}** We review de novo the question of whether Roberts's activities in Georgia were admissible to prove intent. As the proponent of the evidence, the state argued that Roberts's actions in Georgia made it "plausible" that he ended up at Epperson's home around the time of her death. In support of its position, the state relied on *State v. Armstead*, 1st Dist. Hamilton No. C-200417, 2021-Ohio-4000. The defendant in *Armstead* was charged with secretly filming other men in restroom stalls in violation of R.C. 2907.08(B). *Id.* at ¶ 5. Because the defendant maintained that the state had failed to prove he was filming for the purpose of sexual arousal, intent was material to the outcome of the case. *Id.* at ¶ 34. And because intent was at issue, we held that evidence of the defendant previously taking videos of other men going to the restroom was admissible under Evid.R. 404(B). *Id.*

**{¶74}** But, as Roberts repeatedly noted at trial and again argues on appeal, intent was never at issue here. Roberts never argued that Epperson's death was an accident, that the killer acted in self-defense, or that her death resulted from unintentional conduct. Thus, unlike the defendants in *Brogan* and *Armstead*, Roberts did not raise any defenses implicating intent. Because, under *Hartman*, intent is not a material issue for other-acts purposes unless it is genuinely disputed, and because Roberts did not challenge intent, evidence suggesting that Roberts stole Williams's Honda Pilot and was responsible for her smoldering curtains was not relevant to proving intent. *See Hartman* at ¶ 55.

27

**{¶75}** Therefore, the trial court erred at the first step of the *Hartman* framework in finding that proving intent was a permissible purpose for this evidence.

### *B. Motive*

**{¶76}** "Motive evidence establishes that the accused had a specific reason to commit a crime." *Hartman*, 161 Ohio St.3d 214, 2020-Ohio-4440, 161 N.E.3d 651, at ¶ 48. "Motive is what induces an act, the moving power that seeks a result. The conduct involved in other-acts evidence helps to explain *why* the offense charged took place." (Emphasis added and citations omitted.) *State v. Schmidt*, 12th Dist. Warren No. CA2021-12-115, 2022-Ohio-4138, ¶ 44. For example, "a defendant's motive in committing a theft might be to sell the stolen item to get money to buy drugs." *Hartman* at ¶ 48.

**{¶77}** Neither Roberts's taking of Williams's Honda Pilot nor her observation of smoldering curtains in her dining room at the time of his departure helps explain Roberts's motive for murdering or robbing Epperson, at least not on the record before us. "[M]otive is that sense of need or desire that prompts a person to act." *Schmidt* at ¶ 45. Roberts's actions in Georgia did not provide him with a need or desire to then murder his mother in Cincinnati that we can discern from the record before us. No witness explained any connection between the two events other than that Roberts's activities at Williams's house temporally preceded Epperson's death. Accordingly, the trial court again erred at the first step of the *Hartman* framework in finding motive was a permissible purpose for the Georgia evidence.

### *C. Preparation*

**{¶78}** Evidence of a defendant's actions in preparing to commit the charged offenses may be admissible under Evid.R. 404(B). For example, in *State v. O'Connell*, we reasoned that evidence of a defendant grooming his victims to prepare them for sexual activity, including befriending and mentoring his victims, buying them gifts, and paying them to do odd jobs in his home, was admissible to show preparation. *State v. O'Connell*, 2020-Ohio-1369, 153 N.E.3d 1771, ¶ 21 (1st Dist.). Likewise, in *State v. Mielke*, the court held that binoculars and handcuffs recovered from the car the defendant was found in were admissible as evidence of the defendant preparing to kidnap the victim. *State v. Mielke*, 10th Dist. Franklin No. 10AP-48, 2011-Ohio-277, ¶ 18.

**{¶79}** The state contends that evidence of Roberts taking Williams's Honda Pilot established a sequence of events leading up to the murder of Epperson just one day later and that this was evidence of Roberts's preparation. But the test for preparation evidence is not simply whether an act fits within a sequence of events leading to the commission of the crime. Rather, as *O'Connell* and *Mielke* emphasize, the nature of the other acts committed by a defendant must relate to the nature of the crime charged. Typically, the other acts lend themselves to the instrumentality used in the commission of the crime, such as the grooming of victims for sexual abuse in *O'Connell* and the storage of binoculars and handcuffs in the defendant's car for an attempted kidnapping in *Mielke*. *See O'Connell* at ¶ 21; *see also Mielke* at ¶ 18.

**{¶80}** At best, Roberts taking Williams's Honda Pilot without her permission was a means of transportation. It placed him near the location of the criminal activity, but it did not provide Roberts with the instrumentality to commit aggravated robbery

and aggravated murder. Further, because Williams did not testify as to why Roberts might have left so suddenly, there was no reason to assume his departure from Georgia was evidence of his preparation to rob and murder Epperson in Cincinnati. Thus, given the lack of evidence suggesting that Roberts took Williams's Pilot as an instrumentality of Epperson's murder, we do not see how this action was relevant in proving preparation. We therefore hold the trial court erred at step one of the *Hartman* framework in finding preparation was a permissible purpose for admitting evidence of Roberts taking Williams's Honda Pilot.

{¶81} We reach the same conclusion as to Williams's observation of smoldering curtains in her dining room at the time of Roberts's departure. To begin, reviewing de novo the purpose for which the testimony was admitted, we harbor concerns about whether Williams's testimony satisfies *Hartman*'s requirement that the defendant actually commit the wrongful other act being introduced at trial. *See Hartman*, 161 Ohio St.3d 214, 2020-Ohio-4440, 161 N.E.3d 651, at ¶ 27-28. With regard to her curtains, Williams did not testify that she saw fire or smoke. She only testified that it appeared as if her dining room curtains were smoldering. Further, she testified that she did not check her smoke alarm due to her high ceilings. Thus, it is unclear that Williams's curtains were ever actually set on fire. It is equally, if not more troubling, that Williams never actually connected Roberts to what she observed. She noted the timing of her observations coincided with his departure, but she did not testify that she saw Roberts tampering with her smoke alarm or dining room curtains. In fact, she testified that she was not sure if Roberts could have reached her smoke alarm given the height of her ceilings.

**{¶82}** Given the ambiguous nature of this testimony, we do not see how it was relevant in proving preparation. The trial court found that "the proximity and time of the act definitely [was] probative of a sequence of events leading up to the commission of the offense in this case." But this reasoning fails to identify how setting fire to Williams's curtains somehow facilitated the later murder of Epperson, as would speak to preparation to commit a crime. And as we will explain in more detail below, the trial court did not include a common scheme or plan as a permissible purpose for this evidence after reviewing *Hartman*. We agree with that decision. Thus, considering admissibility de novo, we hold that Williams's testimony about the curtains was not admissible to prove preparation.

**{¶83}** Moreover, not only was Williams's testimony regarding the smoldering curtains inadmissible to prove Roberts's preparation to commit the charged offenses, the trial court also abused its discretion in the step two weighing process under *Hartman*. At the outset, the trial court acknowledged that this evidence had no probative value. Despite this acknowledgment, the trial court denied Roberts's Evid.R. 404(B) motion, because it found the prejudicial impact of this testimony was minimal. But the threshold question in determining the admissibility of evidence is whether it is relevant. *Hartman* at ¶ 24, citing Evid.R. 401. This evidence was not likely to make a fact of consequence in this case more or less probable.

**{¶84}** And we do not agree with the trial court that this evidence was minimally prejudicial. Even though Williams did not accuse Roberts of setting her dining room curtains on fire or disabling her smoke alarm, it was very likely that a juror would have taken her testimony to mean that Roberts had attempted to set her residence on fire while she was inside and then fled from the scene. This inference

would have been highly prejudicial in a case where Roberts was accused of then murdering his mother, as it painted him as a person likely to commit acts of physical violence towards his loved ones. "[W]hen such evidence is only slightly probative of a nonpropensity theory but has a high likelihood of unfairly prejudicing the defendant or confusing or misleading the jury, the evidence must be excluded." *Id.* at ¶ 33. Thus, not only was the evidence regarding the curtain incident irrelevant, but it was also highly prejudicial. It should therefore have been excluded.

{¶85} Accordingly, with regard to preparation, we hold that evidence of Roberts's taking Williams's Honda Pilot and the curtain incident was inadmissible to prove preparation at step one.

### D. Plan

{¶86} As Roberts notes, the trial court initially instructed the jury that they could also consider evidence of Roberts's actions in Georgia as evidence of a plan. This initial instruction came during the course of testimony when the trial was ongoing. But after hearing argument regarding the admissibility of other-acts evidence and reviewing *Hartman*, the trial court declined to include plan as a purpose in its final jury instructions at the close of evidence.

{¶87} We agree with the trial court's ultimate determination that plan was not a permissible purpose. While evidence of a plan refers to a larger criminal scheme of which the crime charged is only a portion, preparation evidence speaks to actions a defendant takes to commit the charged offense. *See Hartman*, 161 Ohio St.3d 214, 2020-Ohio-4440, 161 N.E.3d 651, at ¶ 40. For example, evidence that a defendant recently robbed a warehouse to steal a barrel of the ingredient methylamine could be admissible to show the defendant's scheme to produce methamphetamine. *Id.* at ¶ 42.

But none of Roberts's actions in Georgia provided him with the instrumentality needed to rob and murder Epperson in Cincinnati. Therefore, none of Roberts's actions in Georgia can be construed as being a part of a larger criminal scheme.

**{¶88}** Because the jury should not have considered Roberts's actions in Georgia as part of a plan, the trial court should have provided a curative instruction to that effect. *See State v. Taylor*, 8th Dist. Cuyahoga No. 111694, 2023-Ohio-928, ¶ 42 ("curative instructions have been recognized as an effective means of remedying errors or irregularities that occur during trial"). The jury was previously instructed that it could consider *all* of Roberts's actions in Georgia for the purposes of motive, intent, plan, or preparation, but then was later instructed to only consider Roberts taking Williams's Honda Pilot for the purposes of motive, intent, or preparation. But *Hartman* requires a jury instruction specifically tailored to the admissible purpose under Evid.R. 404(B). Without a curative instruction specifically removing plan from the purposes for which the jury could consider the evidence, there was certainly a possibility that the jury would have considered *all* of Roberts's actions for *all* of the previously mentioned purposes. We therefore hold that evidence of Roberts's actions in Georgia were not admissible to prove a plan, and that the jury should have been provided a curative instruction to that effect.

### *Evid.R. 404(B) and Harmless Error*

**{¶89}** As with Roberts's first assignment of error, the erroneous admission of evidence under Evid.R. 404(B) is subject to harmless error analysis. *State v. Hill*, 1st Dist. Hamilton Nos. C-190638, C-190639, C-190640 and C-190641, 2021-Ohio-294, ¶ 34. For the reasons we explained above, we cannot deem the trial court's Evid.R.

404(B) errors harmless on a theory that there was overwhelming evidence of Roberts's guilt that otherwise supports his convictions.

**{¶90}** Thus, in sum, the trial court erred in admitting evidence of Roberts's prior actions in Georgia for any of the purposes identified in Evid.R. 404(B).[1] These errors were not harmless, as Roberts's convictions for aggravated murder, aggravated robbery, and tampering with evidence were not supported by overwhelming evidence of guilt beyond a reasonable doubt on the remaining record before us. We therefore sustain Roberts's second assignment of error.

### *Prior Calculation and Design*

**{¶91}** Because "[a]n assignment of error challenging the sufficiency of the evidence is potentially dispositive of a defendant's conviction and may not be rendered moot by a remand on any other assignment of error," we next consider Roberts's third assignment of error, which challenges the sufficiency of evidence of prior calculation and design as to the aggravated murder charge under R.C. 2903.01(A). *See State v. Gideon*, 165 Ohio St.3d 156, 2020-Ohio-6961, 176 N.E.3d 720, ¶ 2.

**{¶92}** "In reviewing whether evidence is sufficient to establish the prior-calculation-and-design element of aggravated murder, a court must consider whether the evidence, when viewed in the light most favorable to the prosecution, supports a finding that a defendant acted with advance reasoning and purpose to kill." *State v. Jones*, 166 Ohio St.3d 85, 2021-Ohio-3311, 182 N.E.3d 1161, ¶ 2. Generally, Ohio courts consider factors outlined in *State v. Taylor*, 78 Ohio St.3d 15, 676 N.E.2d 82

---

[1] This is not to say that the state is precluded from introducing evidence that Roberts drove Williams's Pilot from Georgia to Cincinnati or that this particular vehicle provided his means of transportation from his location at Williams's house in Georgia to Epperson's apartment building in Cincinnati, where the vehicle was ultimately found.

(1997), when determining if there was prior calculation and design: (1) did the accused and victim know each other, and if so, was that relationship strained, (2) did the accused give thought or preparation to choosing the murder weapon or murder site, and (3) was the act drawn out or an almost instantaneous eruption of events. The *Taylor* factors, however, are not dispositive. *Jones* at ¶ 17. "Rather, a trier of fact's finding of prior calculation and design is warranted when the evidence shows a defendant had time and opportunity to plan a homicide and the homicide's circumstances show a scheme designed to implement the calculated decision to kill." (Internal quotation marks omitted.) *Id.*

{¶93} Beginning with the first *Taylor* factor, the state did not present evidence of a strained relationship between Roberts and Epperson. Though Williams testified that Roberts's family was not supportive of his sexual orientation, she did not testify that his relationship with Epperson soured because of this. To the contrary, Williams testified that Epperson supported Roberts financially, that Epperson and Roberts spoke weekly, and that their relationship was cordial and loving. Thus, although there was tension between Roberts and his family, the state did not present evidence that this tension affected his personal relationship with Epperson. The first *Taylor* factor therefore weighs against the state.

{¶94} There was, however, circumstantial evidence under the second *Taylor* factor from which the jury could draw a permissible inference that Roberts gave some thought or preparation to choosing the location of the murder. William's Honda Pilot was found in the parking lot of Epperson's apartment building. Epperson's personal notes recovered from her apartment also indicated that she had been searching for

Roberts since he left Williams's home. Though Roberts told Lushin that he helped Epperson with her groceries, he was not seen in the Kroger video footage.

**{¶95}** This evidence, taken together, would permit an inference that Roberts arrived at Epperson's apartment without her knowledge and waited there to attack her. At trial, the state specifically argued for this interpretation of the evidence, and it would not have been impermissible for the jury view the evidence this way. Accordingly, the second *Taylor* factor weighs in favor of the state.

**{¶96}** The third and final *Taylor* factor also weighs in favor of the state. Although this factor asks if the act was drawn out or almost instantaneous, "a defendant can conceive and execute a plan to kill, even if formulated within a few minutes, when there is evidence that the defendant's actions went beyond a momentary impulse and show that he was determined to complete a course of action." *Jones*, 166 Ohio St.3d 85, 2021-Ohio-3311, 182 N.E.3d 1161, at ¶ 26. Therefore, even though Epperson's murder unfolded rather chaotically, that does not mean there was no plan at all.

**{¶97}** To begin, the circumstantial evidence suggesting that Roberts waited for Epperson suggests some foresight and planning. Moreover, Epperson's cause and manner of death was strangulation by homicide. It would have taken at least a few minutes of applied pressure by her attacker to kill her, which implied determination by her attacker. Moreover, the killer placed a grocery bag around Epperson's head following the strangulation, and the evidence, although contested, suggested he may have done this because she had not died from the strangulation itself. From these facts, a reasonable juror could have inferred that Roberts had adopted and carried out a plan to kill. *See id.* As in *Jones*, "[t]his does not mean that the evidence preclude[d]

any other inferences." *Id.* at ¶ 27. But as the appellate court, it is not our role to substitute our judgment for that of the factfinder. *Id.*

{¶98} Accordingly, because we conclude that a majority of the *Taylor* factors weigh in favor of the state, we hold that there was sufficient evidence of prior calculation and design to support Roberts's conviction for aggravated murder under R.C. 2903.01(A) and overrule his third assignment of error.

{¶99} In Roberts's fourth assignment of error, he argues in part that his conviction for aggravated murder under R.C. 2903.01(B) was also not supported by sufficient evidence. But that charge merged with his charge under R.C. 2903.01(A). Because he was never convicted of aggravated murder under R.C. 2903.01(B) due to the merger, he cannot appeal that charge. *See State v. Wright*, 10th Dist. Franklin No. 18AP-770, 2019-Ohio-5201, ¶ 34. Roberts's fourth assignment of error is accordingly overruled to the extent it challenges his aggravated murder conviction.

### *Aggravated Robbery*

{¶100} We next consider Roberts's challenge to the sufficiency of the evidence as to his conviction for aggravated robbery, which is the remainder of his fourth assignment of error. Because his convictions for aggravated murder and aggravated robbery involved separate and identifiable harm for each offense, we will consider this challenge despite the trial court's merger of these charges. *See State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, ¶ 23.

{¶101} To determine whether a conviction is supported by sufficient evidence, we inquire "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574

N.E.2d 492 (1991), paragraph two of the syllabus; *see State v. Curry,* 1st Dist. Hamilton No. C-190107, 2020-Ohio-1230, ¶ 11.

{¶102} R.C. 2911.01(A)(3) provides that, "No person, in attempting or committing a theft offense * * * or in fleeing immediately after the attempt or offense shall * * * [i]nflict, or attempt to inflict, serious physical harm on another." Here, Roberts was found with Epperson's car and wallet in Indiana, soon after Epperson was found murdered in Cincinnati. And as we have discussed at length above, ample evidence introduced at trial, including Roberts's own statements, placed Roberts at Epperson's apartment around the time that she was robbed and murdered. We therefore hold that Roberts's conviction for aggravated robbery was supported by sufficient evidence and overrule Roberts's fourth assignment of error in this regard.

### Manifest Weight

{¶103} In his sixth assignment of error, Roberts contends that his convictions for aggravated murder and aggravated robbery were against the manifest weight of the evidence. Given our holding reversing these convictions and remanding for a new trial on other grounds, this claim is moot. *See State v. Bentley*, 11th Dist. Lake Nos. 2021-L-089 and 2021-L-090, 2022-Ohio-1099, ¶ 17. Roberts's sixth assignment of error is moot and we decline to address it.

### Evidence Tampering

{¶104} Because it implicates his ability to be retried, however, we consider Roberts's fifth assignment of error in which he contends that there was insufficient evidence to support his conviction for evidence tampering. This conviction rested entirely upon Roberts's conduct in resetting his cellphone, which erased the contacts and other data from the phone.

**{¶105}** In this assignment of error, Roberts argues that the state failed to present sufficient evidence of venue in the state of Ohio and that he reset his cellphone at a time when he had the requisite knowledge under R.C. 2921.12(A), the evidence tampering statute. We agree in part.

**{¶106}** With regard to venue, "[t]he elements of the offense charged and the venue of the matter are separate and distinct." *State v. Jackson*, 141 Ohio St.3d 171, 2014-Ohio-3707, 23 N.E.3d 1023, ¶ 143. And under R.C. 2901.12(H), "an offender who commits offenses in different jurisdictions as part of a course of criminal conduct may be tried in any one of those jurisdictions." *Id*. at ¶ 145. Because Roberts was charged with committing offenses in Indiana and Cincinnati as part of a course of criminal conduct, and the state submitted receipts and video footage placing Roberts in both locations, the state proved venue beyond a reasonable doubt. *See id*. at ¶ 143. We thus reject this portion of Roberts's contention that the state failed to introduce sufficient evidence as to venue.

**{¶107}** But we agree with Roberts that the state failed to prove he had knowledge of an ongoing investigation when he reset his cellphone. Knowledge of an ongoing (or likely) investigation or proceeding is an essential element of evidence tampering under R.C. 2921.12(A). *State v. Straley*, 139 Ohio St.3d 339, 2014-Ohio-2139, 11 N.E.3d 1175, ¶ 16. Therefore, "the tampering statute applies only when a person intends to impair availability or value of evidence in an *ongoing* investigation or proceeding." (Emphasis added.) *Id*. at ¶ 17.

**{¶108}** Here, Lushin was not even aware that Roberts was a potential suspect in Epperson's murder until nearly one day after his roadside questioning of Roberts. And it was by chance that Lushin encountered Roberts. There is nothing in the record

that suggests Roberts had knowledge that an investigation into Epperson's death was ongoing and that he would encounter an officer during his travel. Moreover, the record contains no evidence as to when, precisely, Roberts reset his cellphone. Critically, we do not know whether the phone was reset before or after Epperson's death. Without evidence of this timing and the knowledge it would potentially imply on Roberts's part, his action in resetting his cellphone does not amount to evidence tampering. Thus, we agree with Roberts that his conviction for evidence tampering was not supported by sufficient evidence.

{¶109} Accordingly, Roberts's fifth assignment of error is sustained, his conviction for evidence tampering is reversed, and he is discharged from further prosecution on that charge.

### *Conclusion*

{¶110} Because Roberts was in custody for practical purposes when he began answering Lushin's questions at the 15:59-minute mark of the body-worn camera footage of the traffic stop but was never given *Miranda* warnings, any statements Roberts made after this time stamp, including the specific statements he challenges on appeal, were inadmissible. The trial court committed prejudicial error in admitting these un-Mirandized statements. We accordingly sustain Roberts's first assignment of error.

{¶111} We further sustain Roberts's second assignment of error under Evid.R. 404(B). Evidence of Roberts's prior acts in Georgia were inadmissible for any of the purposes enumerated in Evid.R. 404(B).

{¶112} We overrule Roberts's third assignment of error, because there was sufficient evidence of prior calculation and design as to his conviction for aggravated

murder under R.C. 2903.01(A). We have no jurisdiction to address Roberts's arguments as to aggravated murder under R.C. 2903.01(B), because that count was merged with the charge under R.C. 2903.01(A). We overrule Roberts's fourth assignment of error, because his aggravated murder conviction under R.C. 2903.01(A) and his aggravated robbery conviction were supported by sufficient evidence. Roberts's arguments under his sixth assignment of error challenging his aggravated murder and aggravated robbery convictions as against the manifest weight of the evidence are moot and we do not address them.

{¶113} Lastly, we hold that Roberts's conviction for evidence tampering was not supported by sufficient evidence and sustain his fifth assignment of error.

{¶114} Therefore, we reverse the trial court's judgment as to Roberts's conviction for tampering with evidence and discharge Roberts from future prosecution on that charge under R.C. 2921.12(A). This cause is remanded for a new trial in accordance with this opinion and the law on the charges of aggravated murder and aggravated robbery. All other aspects of the trial court's judgment are affirmed.

Judgment accordingly.


ZAYAS, P.J., concurs in judgment only. BERGERON, J., concurs.

Please note:

The court has recorded its own entry on the date of the release of this opinion.