[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Roberts*, Slip Opinion No. 2025-Ohio-5120.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports.  Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2025-OHIO-5120

THE STATE OF OHIO, APPELLANT, *v.* ROBERTS, APPELLEE.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Roberts*, Slip Opinion No. 2025-Ohio-5120.]**

*Criminal law—Crim.R. 52(A)—Trial court's errors were harmless beyond a reasonable doubt because even when the erroneously admitted evidence is excised, overwhelming evidence of defendant's guilt remains—Court of appeals' judgment reversed and convictions reinstated.*

(No. 2024-0854—Submitted May 14, 2025—Decided November 14, 2025.)

APPEAL from the Court of Appeals for Hamilton County,

No. C-220615, 2024-Ohio-1604.

_____

KENNEDY, C.J., authored the opinion of the court, which DEWINE, DETERS, HAWKINS, and SHANAHAN, JJ., joined and CARR and BRUNNER, JJ., joined except as to footnote 1.  DONNA J. CARR, J., of the Ninth District Court of Appeals, sat for FISCHER, J.

**KENNEDY, C.J.**

{¶ 1} In this discretionary appeal from a judgment of the First District Court of Appeals, we decide whether the appellate court erred in reversing appellee Elijah Blaine Roberts's convictions for aggravated murder and aggravated robbery based on its conclusion that the trial court's errors in admitting Roberts's custodial statements and certain other-acts evidence were not harmless. After a thorough review of the record, we hold that the trial court's errors were harmless beyond a reasonable doubt because even when the erroneously admitted evidence is excised, there remains overwhelming evidence of Roberts's guilt.

{¶ 2} On July 31, 2019, Tracey Epperson entered her apartment in Cincinnati, Ohio, with groceries and her purse. She was violently attacked in the entryway and strangled to death with the strap of her purse.

{¶ 3} Later that same day, in Tipton, Indiana, Deputy Whitney Lushin of the Tipton County Sheriff's Office conducted a wellness check on the driver of a Honda CR-V who had pulled over on the side of a highway. The driver initially lied about his name and age but was later identified as Epperson's son, Elijah Blaine Roberts. While Roberts was detained on the side of the road, Lushin learned that the Honda CR-V was Epperson's and discovered that Roberts was also in possession of Epperson's wallet. Inside the wallet was a folded Kroger receipt, Epperson's Ohio driver's license, her credit cards, and some cash. Roberts was arrested for providing false information to the deputy.

{¶ 4} The next day, Cincinnati police discovered Epperson's body in the entryway of her apartment. After an investigation, Roberts was indicted by a Hamilton County grand jury on five counts, including two counts of aggravated murder and one count of aggravated robbery.

{¶ 5} Before trial, in response to a motion by Roberts, the trial court suppressed Roberts's statements that were recorded by Lushin's body-worn camera after the 43:49 minute mark of the video, which is the point in the video when

Roberts is placed under arrest. The trial court determined that the statements after that point were custodial statements. The court denied Roberts's motion in limine to exclude other-acts testimony from Roberts's aunt, Regina Williams.

{¶ 6} At trial, the State presented numerous witnesses and items of evidence. The jury found Roberts guilty of two counts of aggravated murder and one count each of aggravated robbery and tampering with evidence. In a single count tried to the bench, the trial court found Roberts guilty of receiving stolen property.

{¶ 7} On appeal, the First District held that Roberts had been in police custody starting at the 15:59 minute mark of the video and that the trial court had erred by admitting the statements Roberts made to Lushin after that point. The court of appeals also held that the trial court had erred by admitting Williams's other-acts testimony. Moreover, the court of appeals determined that these errors were not harmless, and it reversed Roberts's convictions for aggravated murder, aggravated robbery, and tampering with evidence. But the court of appeals determined that because the State had presented sufficient evidence to prove that Roberts had committed the offenses of aggravated murder and aggravated robbery, Roberts could be retried on those counts. However, the court of appeals determined that the State had not presented sufficient evidence to prove that Roberts committed the offense of tampering with evidence, so it held that Roberts could not be retried on that count. The court of appeals found Roberts's manifest-weight-of-the-evidence claim moot, based on its reversal of his convictions, and it remanded the cause for a new trial. The State appealed to this court and asks us to reverse the court of appeals' judgment as to the aggravated-murder and aggravated-robbery convictions.

{¶ 8} We hold that the First District erred in reversing Roberts's convictions for aggravated murder and aggravated robbery because after excising the evidence that the court of appeals determined had been improperly admitted, we find that the

3

remaining evidence overwhelmingly proves Roberts's guilt. Therefore, any error in the trial court's admitting the custodial statements and other-acts evidence was harmless beyond a reasonable doubt.

{¶ 9} Although the court of appeals determined that Roberts's manifest-weight-of-the-evidence assignment of error was moot because it reversed his convictions on other grounds, we need not remand the case to the court of appeals to address that assignment of error. Given our decision that there is overwhelming evidence of guilt even without the improperly admitted evidence, Roberts's convictions for aggravated murder and aggravated robbery necessarily are not against the manifest weight of the evidence.

{¶ 10} For these reasons, we reverse the judgment of the court of appeals and reinstate Roberts's convictions for aggravated murder and aggravated robbery.

## I. FACTS

### A. Epperson's Murder

{¶ 11} On the afternoon of July 31, 2019, Epperson entered her apartment on East Tower Drive in Cincinnati, Ohio, wearing a long-strapped white purse across her body and carrying groceries she had recently purchased from a Kroger grocery store and a sandwich and bag of chips from Jimmy John's (which were in a Jimmy John's bag that was tucked inside a Kroger grocery bag). As she entered her apartment, Epperson was violently attacked and strangled with the strap of her purse until she was dead.

### B. Days Leading Up to Epperson's Murder

{¶ 12} In the summer of 2019, Roberts was living with Regina Williams—his paternal aunt—in Augusta, Georgia. But on the evening of July 29, Williams, who typically kept her purse with her at all times, went upstairs in her home and momentarily left her purse downstairs in the kitchen. Among other things, her car keys were inside her purse. Williams retrieved her purse from the kitchen and took

it upstairs but then saw Roberts drive off in her car, a Honda Pilot, without her permission, sometime between 9:30 p.m. and 11:00 p.m.

{¶ 13} Williams called the police to report her car stolen. And she called the police a second time that night when she noticed that the curtains in her dining room were "smoldering."

{¶ 14} Williams then called Roberts's mother, Epperson, and told her what had happened. Epperson became very concerned, and the two women stayed in contact throughout July 29 and 30, talking and texting about their efforts to locate Roberts. Williams suggested to Epperson that she go online and track the cellphone that Epperson had given Roberts. Williams also told her that she could contact her cellphone provider if she had problems tracking the cellphone.

{¶ 15} Evidence introduced at trial showed that on July 30, Roberts stopped at a Food Mart in Gaffney, South Carolina, at 7:24 (apparently in the morning) and an Exxon gas station in Connelly Springs, North Carolina, at 9:25 a.m. And at 9:52 p.m., Roberts was standing at the front counter of the Glenway Avenue McDonald's restaurant in Cincinnati, Ohio—approximately 1.7 miles from Epperson's apartment.

### C. Roberts's Arrest in Indiana

{¶ 16} Lushin, who, as noted above, was a deputy with the Tipton County Sheriff's Office, was on patrol on July 31, 2019. Shortly after 7:00 p.m., he noticed a car, a Honda CR-V, that was stopped in the grassy area next to a two-lane highway—State Road 28 in Tipton County, Indiana.

{¶ 17} Lushin, who was equipped with a body-worn camera, approached the car and spoke to the driver, who was later identified as Roberts. At the outset, Roberts explained that the car was not disabled but that he had pulled over to connect his cellphone to the car. Lushin asked Roberts where he was headed, and he replied, "Wisconsin." However, Roberts could not recall the name of the city he was going to; he said he was just driving up there to "check[] it out."

{¶ 18} Lushin asked Roberts for his identification, and Roberts responded that he did not know where it was and that it was somewhere in his bag. Lushin asked Roberts why he was so nervous, and Roberts said, "I don't know. . . . It's just, I wasn't expecting—like, I just pulled over and I was just—." Lushin saw that Roberts's hands were shaking.

{¶ 19} Because Roberts did not produce identification, Lushin asked him for his legal name and date of birth. At first, Roberts identified himself as "Eli B. Blaine" and said he was 19 years old. Roberts then said that his name was Eli Blaine, with no middle name. Roberts told Lushin only the month and day of his date of birth, July 3, but not the year. So Lushin confronted him about lying.

{¶ 20} Roberts responded by stating that he was in the process of changing his name and that he was trying to get used to his new name but that his prior name was Elijah Roberts. Roberts then gave Lushin his full date of birth and admitted that he was 21 years old. Lushin asked Roberts who owned the car. Roberts stated that it was his mother's car, and when Lushin asked whether she knew he had the car, Roberts said that she did.

{¶ 21} Lushin then asked Roberts a series of questions: why had he lied, had he stolen the car, did he have outstanding warrants, was his license suspended, was he a missing person, was he fleeing after committing a murder in Ohio. Roberts responded "no" to each of the questions. Thereafter, Lushin had the Tipton County dispatcher search Roberts's name and date of birth through several different state databases, and thereby, he determined that Roberts's license was under suspension.

{¶ 22} Lushin next asked Roberts for his mother's name. Roberts said that his mother's name was Tracey Epperson and that she lived in Cincinnati, Ohio.

{¶ 23} The information that follows was recorded beginning at minute mark 15:59 of the video from Lushin's body-worn camera. (This is the time in the video at which the court of appeals determined that Roberts was in police custody and therefore the time after which any statements Roberts had made to Lushin were

custodial and had been erroneously admitted by the trial court. 2024-Ohio-1604, ¶ 56 (1st Dist.).)

{¶ 24} Roberts gave Lushin permission to retrieve his cellphone from the car. Lushin retrieved the cellphone and, while walking toward Roberts with Roberts's cellphone, Lushin asked him whose wallet was in the center console of the car. Roberts said that it was his mother's wallet. He explained that because she had been in a hurry to unload groceries, she had left it in the center console, and he said that he had not realized it was there until it was "too late." Lushin handed the cellphone to Roberts and asked him to pull up his mother's phone number. At this point, Roberts said that she was actually his stepmother, not his mother.

{¶ 25} Roberts started to call Epperson, but Lushin told Roberts that he would call her instead. Lushin inquired why Roberts did not have his stepmother's name saved in his cellphone, and Roberts replied that he had just reset it. Lushin then left a voicemail message for Epperson and asked the Tipton County dispatcher to try to get in touch with Epperson by calling her as many times as possible. Lushin told Roberts that it was odd that his stepmother had given him permission to take the car to Wisconsin but left her wallet in the center console. Lushin also noted to Roberts that he had changed his story: Roberts first said that Epperson was his mother and then he said she was his stepmother.

{¶ 26} Thereafter, Deputy William Cline, a K-9 handler, arrived with a police canine. The canine alerted on the car, and because of the alert, Lushin and Cline searched the car. Lushin first retrieved Epperson's wallet from the car and opened it. In the center of the wallet was a Kroger receipt, date-stamped July 31, 2019, and time-stamped 2:18 p.m. Epperson's Ohio driver's license, her credit cards, and some cash were also in the wallet.

{¶ 27} As the search continued, Lushin asked the Tipton County dispatcher to contact the Cincinnati Police Department to do a welfare check on Epperson. In a backpack on the front passenger seat, Lushin found Roberts's wallet and a

marijuana grinder. After a drug test on the contents of the grinder returned a negative for marijuana, Lushin returned the marijuana grinder to a pink tub that was on the front passenger side floorboard. Lushin then placed Roberts under arrest for providing false information.

### D. July 31 Wellness Checks on Epperson

{¶ 28} The Tipton County dispatcher contacted the Cincinnati Police and Fire Dispatch at 7:49 p.m. on July 31 ("first 9-1-1 call"). The Tipton County dispatcher requested a wellness check on Epperson at her East Tower Drive apartment because a Tipton County deputy had encountered a driver who was found to be in possession of Epperson's car, her wallet, her Ohio driver's license, and her credit cards. The dispatcher further explained that she had attempted to contact Epperson 11 times and that Epperson had not answered and had not called back.

{¶ 29} The Tipton County dispatcher called the Cincinnati Police and Fire Dispatch again at 8:16 p.m. ("second 9-1-1 call") to see if officers had conducted the requested wellness check on Epperson. The Cincinnati dispatcher told the Tipton County dispatcher that officers had not yet been dispatched because it was a busy night, but he assured the Tipton County dispatcher that officers would conduct a wellness check and that someone would call her back with the results. The Tipton County dispatcher explained that the deputy was concerned about Epperson because the person in possession of her car had lied about his identity and because most of the property in the car belonged to Epperson.

{¶ 30} After the second 9-1-1 call, Cincinnati Police Officers Zachary Kress and Naomi Simmons were dispatched at 8:54 p.m. to Epperson's apartment for a wellness check. The officers knocked on her door but got no answer. After confirming with their supervisor that they did not have authority to enter the apartment, they left.

*E. August 1 Wellness Check on Epperson*

**{¶ 31}** On August 1, Marian Sims, Epperson's sister who lives in Fredericksburg, Virgina, called Cincinnati Police and Fire Dispatch asking for a wellness check on Epperson ("Marian Sims's 9-1-1 call"). She told the dispatcher that she had received a call informing her that Epperson had not shown up for work and that that was uncharacteristic of her. She explained that she had attempted to contact Epperson by phone but that there was no answer.

**{¶ 32}** Cincinnati Police Officers Andrew Snape and Austin Lee were dispatched to Epperson's apartment for a wellness check at 1:27 p.m. on August 1. Snape's body-worn camera was activated when the officers got out of the police cruiser.

**{¶ 33}** Snape and Lee entered the apartment building, went to Epperson's door, and knocked twice. Snape then noticed that the door was "cracked slightly open," so he opened the door and announced their presence.

**{¶ 34}** Snape's body-worn camera captured the scene. Epperson was lying face down with a white purse strap around her neck and a plastic bag over her head. Snape called his supervisor and the Cincinnati Fire Department.

**{¶ 35}** Paramedics from the Cincinnati Fire Department were dispatched to Epperson's apartment. Finding that Epperson had no signs of life, the paramedics turned the scene over to the police. The officers secured the scene until the homicide detectives arrived.

*F. The Investigation and Indictment*

**{¶ 36}** Homicide Detective Kimberly Ann Kelley and Detective Kurt Ballman, along with Criminalists Jennifer Lane and Derek Foote, all Cincinnati Police Department employees, arrived at Epperson's apartment around 3:00 p.m. Once there, the detectives and the criminalists met outside the apartment with Snape and Lee to get a brief synopsis of why the officers had been dispatched to the scene and what they had observed.

**{¶ 37}** The detectives entered the apartment, surveyed the scene, and looked around the entire apartment. The criminalists then began processing the scene (i.e., taking pictures and collecting evidence), and the detectives pointed out items to be photographed that they thought could be significant. The detectives then went to the surrounding apartments to see if there had been any witnesses, but they did not find any.

**{¶ 38}** Kelley's supervisor arrived on the scene thereafter and informed the detectives that on July 31, officers had been dispatched to conduct a wellness check on Epperson because her son, Roberts, had been stopped on the side of a road in Indiana in her car and had lied about his identity to the deputy who had approached the car to see if he needed help. The detectives were also informed that Epperson's wallet, driver's license, and credit cards had been found in the car. Kelley subsequently talked to Lushin and watched the video of his interaction with Roberts. The detectives and Pham then traveled to Tipton, Indiana, to process Epperson's car.

**{¶ 39}** During the investigation, the detectives learned that Roberts had taken his aunt's Honda Pilot on July 29. That car was found by police on August 1 in the parking lot adjacent to Epperson's apartment building, and it was towed to the Cincinnati Police Department garage, where it was processed by a criminalist.

**{¶ 40}** On August 9, 2019, Roberts was indicted on two counts of aggravated murder—one in violation of R.C. 2903.01(A) and the other in violation of R.C. 2903.01(B), one count of aggravated robbery in violation of R.C. 2911.01(A)(3), one count of tampering with evidence in violation of R.C. 2921.12(A)(1), and one count of receiving stolen property in violation of R.C. 2913.51(A).

## II. THE TRIAL AND APPEALS

### A. Pretrial Motions

{¶ 41} Prior to trial, Roberts moved to suppress the statements he had made to Lushin, asserting that he was in police custody when he made the statements and had not been given *Miranda* warnings. *See Miranda v. Arizona*, 384 U.S. 436 (1966). He asserted violations of the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Ohio Constitution. The trial court ruled that Roberts's statements made during the first 43 minutes and 49 seconds of the 55 minute and 18 second encounter were admissible.

{¶ 42} Roberts also filed a motion in limine to exclude the portion of the video from Lushin's body-worn camera during which Lushin said to another deputy that based on Roberts's behavior, Lushin thought Roberts had just killed his mother. The trial court granted the motion in limine to exclude that portion of the video. But the trial court denied Roberts's motion to suppress the portion of the video during which Lushin asked Roberts, "Did you commit a murder in Ohio and you're trying to get away?" (Roberts did not respond to the question on the video.)

{¶ 43} Roberts also moved to sever count five of the indictment—the count charging receiving stolen property—from the other counts. He alleged that that count, which charged an offense related to his aunt's car, was not sufficiently related to the other four counts to be charged in the same indictment. Because the trial court denied the motion for severance, Roberts waived a jury trial on count five of the indictment on September 20, 2022—the first day of trial. Roberts signed the waiver, and after the colloquy to ensure that Roberts understood that that count would be tried to the judge, not a jury, the court accepted Roberts's waiver of a jury trial as to count five.

{¶ 44} Defense counsel made an oral motion in limine to exclude any other-acts testimony from Williams regarding the receiving-stolen-property count. The State argued against the motion.

{¶ 45} The trial court denied the motion to exclude Williams's testimony about the events that occurred in Augusta, holding that its probative value outweighed any prejudicial effect; the trial court did indicate that a limiting instruction would be given to the jury, however. Defense counsel renewed their objection to Williams's testimony during the trial, but the trial court overruled the objection.

{¶ 46} The State and defense counsel then stipulated to the authenticity and admissibility of the three 9-1-1 calls and the July 31 Kroger surveillance video.

*B. Testimony and Other Evidence*

{¶ 47} At trial, Williams recounted the events leading up to Roberts's leaving her residence on July 29, 2019. She also explained why Roberts had been living with her at that time, and she described her relationship with Roberts and Epperson's relationship with Roberts.

{¶ 48} In June 2019, Williams attended the wedding of Roberts's brother, and she noticed that there were problems between Roberts and other family members. Roberts had recently come out to his family as gay, and Williams thought that that was one of the reasons for the problems. So Williams invited Roberts to go back to Augusta, Georgia, with her for a while. Williams believed that she and Roberts had a pleasant, cordial relationship. They often did things together, such as go to the gym and go shopping. And on the day that Roberts abruptly left her home, the two had not had a fight. Williams also stated that she would not have permitted Roberts to leave with her car, because he did not have a driver's license.

{¶ 49} As for Epperson's relationship with Roberts, Williams testified that she could only say what she had seen. She said that while Roberts was living with her, Epperson and Roberts talked on the phone every week and had a "very cordial relationship; very loving." Williams said that Epperson was very involved in

Roberts's life—she paid his cellphone bill and the rent for an apartment in Toledo that Roberts no longer lived in, and she sent him money every week.

{¶ 50} But when pressed for more information about Epperson's relationship with Roberts, Williams said that she did not know the details of their relationship. She did not know whether Epperson had always been present in Roberts's life. Williams explained: "I was in the military, and I always lived away from, like, the family, so, you know, I don't know details about—specific details about, you know, their life. Even though I kept in contact, I just always lived away."

{¶ 51} Williams testified that she had never heard Roberts express any ill will toward Epperson or heard Epperson express any fear of him. But in the six weeks that Roberts lived with her in Augusta, Williams noticed him exhibiting unusual behavior, including having frequent conversations with himself.

{¶ 52} Next, Cincinnati Police Officer Kress testified about the wellness check that he and his partner made at Epperson's apartment on July 31 at 9:04 p.m. The prosecutor played the two 9-1-1 calls that the Cincinnati Police and Fire Dispatch received from the Tipton County dispatcher, and Kress confirmed that those were the calls that resulted in his being dispatched to Epperson's apartment.

{¶ 53} Kress testified that he had knocked several times on the apartment door but got no answer. He then turned the doorknob, and it turned. He called his supervisor and was told that he could not enter the apartment, so the officers left.

{¶ 54} Next, Snape, a Cincinnati Police sergeant at the time of trial, testified that he and Officer Lee were dispatched on August 1 at 1:27 p.m. for a wellness check at Epperson's apartment. He confirmed that the dispatch resulted from Marian Sims's 9-1-1 call, and that 9-1-1 call was played for the jury.

{¶ 55} Snape recounted that after knocking on the door, he noticed that it was "cracked slightly open, just a little bit," so he opened the door. He described what he saw when he opened the door: Epperson's body was lying a few feet from

the door, face down with a plastic bag over the head; groceries were scattered on the floor; and a chair was broken. The video from Snape's body-worn camera was then played for the jury.

{¶ 56} Snape testified that he had known as soon as he opened the door that he and Lee had walked into the scene of a homicide. It was evident to Snape that a violent struggle had taken place the moment Epperson walked into her apartment carrying her groceries. He described the scene in more detail. He said that a white purse strap was around Epperson's neck and a plastic bag was over her head. Some groceries were in bags on the floor and others had spilled out, the dining table appeared to be displaced from its normal position, and one of the wooden dining chairs was broken—the legs and the back of the chair were no longer attached to the seat.

{¶ 57} Next, Cincinnati Fire Department Paramedic Kurt Baker testified that he and other paramedics on the scene verified that Epperson was deceased, and he noted that the situation surrounding Epperson's death looked suspicious. Baker explained the methods that paramedics use to assess how long a person has been deceased, such as by checking for rigor mortis (the temporary rigidity of muscles after death) and lividity (the discoloration of the skin after death). He explained that rigor mortis occurs because the muscles tense up over time after death and that lividity occurs because when the heart stops, blood ceases circulating, and the pressure in a person's circulation system drops, and gravity causes the blood to pool in the lowest point of the body. Lividity presents like a bruise.

{¶ 58} Baker said that another paramedic had lifted Epperson's arm, observed that the skin was cold to the touch, and confirmed that both rigor mortis and lividity had set in. Based on those cursory findings, Baker opined that Epperson had been dead for at least 3 to 12 hours.

{¶ 59} Next, Officer Lushin, who had transitioned to working for the Whitestown Metropolitan Police Department at the time of the trial, recounted his

contact with Roberts on July 31, 2019, when he was a deputy at the Tipton County Sheriff's Office. Lushin described Tipton County as a small rural community, and he said that the county's largest city is Tipton, which is a two-and-a-half-hour drive from Cincinnati.

{¶ 60} On July 31, at 7:00 p.m., Lushin was traveling west on State Road 28 when he observed a Honda CR-V stopped alongside the highway. State Road 28 is a very busy two-lane highway that runs through Tipton; it does not have a shoulder, so the car was to the right of the road in a grassy area. Lushin pulled behind the car and activated the lights of his patrol car for his safety and the safety of other motorists, and he then performed a wellness check on the driver, Roberts. Lushin testified as to his interaction with Roberts, and the video from his body-worn camera was played for the jury.

{¶ 61} Lushin testified that as he walked up to the driver's side of the car, he observed that Roberts "was very, very nervous, overly nervous, for not being pulled over, but just being on the side of the road." Lushin asked Roberts why he was so nervous, and Roberts said he did not know.

{¶ 62} Initially, Roberts said he had identification in a backpack, but he never made any attempt to retrieve it. Lushin recounted his conversation with Roberts: Lushin had asked for his name and had confirmed with him that "Eli" was his legal first name and "Blaine" was his last name. When he asked Roberts how old he was, Roberts did not look at him but instead looked forward, paused, and said that he was 19 years old. However, Roberts provided Lushin with only the month and the day of his birthday, July 3, without giving a year. Lushin testified that at that point, based on his "training and experience," he believed that Roberts was lying about his identity, so he asked Roberts why he was lying to him. Roberts then told Lushin that his name was "Elijah Blaine Roberts," and he gave Lushin his corrected date of birth.

{¶ 63} Lushin provided this information to the dispatcher, who checked several states and relayed to Lushin that Roberts did not have driving privileges. The dispatcher also told Lushin that the Honda CR-V was registered in Ohio and belonged to Epperson.

{¶ 64} Lushin noted that Roberts's statement that he was traveling to Wisconsin was suspicious to him for several reasons: Roberts was unable to say where in Wisconsin he was going, State Road 28 is "not conducive for the route of travel to go from Ohio to Wisconsin," and there was no luggage in the car.

{¶ 65} Additionally, according to Lushin, when he, with Roberts's permission, retrieved Roberts's cellphone from the car so that he could access Epperson's phone number, Lushin confirmed that it was a "woman's pocketbook, like a wallet," that he had observed from outside the car in the center console. Lushin asked Roberts whose wallet was in the center console, and he said it was his mother's. Lushin asked if she had given it to him, and Roberts said he had taken the car while she was unloading groceries, and the wallet had been left inside the center console and he had not noticed it was there "until it was too late."

{¶ 66} It was only after the canine alerted on the car, however, that Lushin retrieved the wallet and opened it. Lushin testified that the wallet contained Epperson's Ohio driver's license and credit cards, along with receipts and cash. Lushin then explained that after he located Epperson's wallet, he and the dispatcher made numerous attempts to contact Epperson by phone. Lushin said that he noticed that when he handed Roberts his cellphone and asked him to pull up his mother's phone number, Roberts had typed in her number. Lushin asked why the number was not saved in his phone, and Roberts said that he had "recently reset" the cellphone. Roberts also then said that Epperson was his stepmother, not his mother. At this point, the attempts to contact Epperson by phone had failed, so Lushin asked the Tipton County dispatcher to call the Cincinnati Police Department to conduct a wellness check on Epperson.

{¶ 67} Lushin then identified a series of photographs of Epperson's Honda CR-V and some of the contents of the car, including Epperson's wallet, her Ohio driver's license, Roberts's South Carolina state identification card, Roberts's backpack, and the marijuana grinder mentioned above. Finally, Lushin admitted that the drug test performed on the grinder was negative for marijuana, but he indicated that Roberts had been placed under arrest because he had provided a false name to law enforcement, which he said is a crime in Indiana.

{¶ 68} Next, Criminalist Lane testified. She explained that criminalists process crime scenes for homicide investigations, personal-crime cases, and bank robberies. She said that criminalists process a crime scene by photographing the scene and collecting evidence, including biological evidence and fingerprints.

{¶ 69} Lane testified that she and Criminalist Foote photographed the whole scene as it existed, untouched, to "fairly and accurately" depict the scene. After photographing the scene as they had found it, the criminalists took a second series of photographs, this time with identifying placards with numbers on them to indicate different pieces of evidence that might be of value in the investigation.

{¶ 70} Lane identified an aerial photograph of Epperson's apartment building and the surrounding neighborhood. The photograph had two "Xs," one marking the apartment building and the other marking the nearby McDonald's restaurant on Glenway Avenue where Roberts had ordered food on the evening of July 30. She also identified the photographs that she said fairly and accurately depicted the murder scene as she found it on August 1, and the pictures were entered into evidence as exhibits.

{¶ 71} Lane testified that when she and Foote entered Epperson's apartment, Epperson's body was "lying immediately to the right of the entry door." Epperson was lying face down on the floor with a white leather-like purse strap around her neck, a plastic bag on her head. Lane said that she could tell that the dining table had been moved from its usual place, and she noted that one dining

chair was broken—two of its legs were to the right of Epperson's body and one leg was underneath the table with the seat of the chair—another chair was lying on the floor, and a third chair was tilted back. Plastic grocery bags containing groceries were strewn on the floor around Epperson's body. Groceries had spilled out of some of the bags, and fresh vegetables and fruit were crushed into the carpet. Lane noted that one of the pictures showed that the lock on the apartment door did not appear to have been tampered with or damaged.

{¶ 72} Lane testified that the white leather-like strap that was around Epperson's neck matched the purse that was sitting on the dining table. The purse was the same color and had the same leather-like texture as the strap, and it had places to attach the clips that were on both ends of the strap. When the coroner arrived, Epperson's body was rolled over and more photographs were taken. The photographs showed that the purse strap was around the front of Epperson's neck and that the plastic trash bag was covering Epperson's head.

{¶ 73} Under Epperson's body were parts from the broken chair, smashed tomatoes and blueberries, and a broken pair of eyeglasses. There were gouges in the wall that appeared to have been made when Epperson and/or the chair fell against it. Additionally, a Jimmy John's bag, with a single sandwich and a single bag of chips, was inside a Kroger bag. The receipt showed that the sandwich and chips were purchased with cash on July 31, 2019, at 2:31 p.m. from the Glenway Avenue Jimmy John's.

{¶ 74} The criminalists then took pictures of the rest of the apartment. Lane noted that the apartment had not been ransacked.

{¶ 75} Lane next explained a picture documenting an open cabinet under the kitchen sink with a box of trash bags protruding from the cabinet; Lane said that the bags appeared to match the bag that was over Epperson's head.

{¶ 76} Near the couch in the living-room area was a clipboard holding several sheets of paper. One sheet had notes on how to locate a cellphone. Another

was dated July 31, 2019, and listed a jail and hospitals in Georgia with notes indicating that Epperson had called them in an attempt to locate Roberts. A third had "findmymobilesamsung.com" written on it. Also written on that sheet was an email address for Roberts and the words "won't show location if phone is powered off or data is turned off."

{¶ 77} On the dining-room table was a white leather-like Franco Sarto purse. The white leather-like strap around Epperson's neck, which was later removed by the coroner, had the same brand name, Franco Sarto, on it. The purse contained a cellphone, cellphone charger, two sets of keys—one for Epperson's car and others for her apartment—personal papers, and miscellaneous items like lotion, a case for glasses, a small notebook, and a bus schedule. Notably, there was no wallet in the purse.

{¶ 78} Lane and Foote swabbed six different items in Epperson's apartment, and the swabs were sent for DNA testing.

{¶ 79} Lane also processed Williams's Honda Pilot that had been located in the parking lot adjacent to Epperson's apartment building. Lane identified the photographs that she had taken of the exterior and interior of the car and they were introduced into evidence.

{¶ 80} Lane testified that she found a debit card in the center-console area with the name "Elijah Roberts" on it. Also in the center-console area were a McDonald's receipt from the Glenway Avenue location, dated July 30, 2019, and time-stamped 9:52 p.m. and a receipt from an Exxon gas station in Connelly Springs, North Carolina, date-stamped July 30, 2019, and time-stamped 9:25 a.m.

{¶ 81} In the back seat of the car was a suitcase containing personal items, including clothes. In the pocket of a pair of pants, Lane found a receipt from a Food Mart in Gaffney, South Carolina, dated July 30, 2019, time-stamped 7:24, and indicating that the customer paid with a card bearing an account number ending in

0721. Lane also swabbed four different areas of the Honda Pilot for DNA, and she dusted the driver's side door frame for fingerprints.

{¶ 82} Next, Criminalist Pham testified. He worked for the Cincinnati Police Department in August 2019 and processed Epperson's Honda CR-V in Tipton County, Indiana. Pham identified the photographs he had taken of the exterior and interior of the car and the car's contents, and the photographs were admitted as exhibits.

{¶ 83} On the front passenger seat, Pham found Epperson's wallet (this is where Lushin had left it after he removed it from the center console and searched it), a backpack, a laptop computer, and a set of keys. On the floorboard of the front passenger compartment was what Pham described as a "pink square tub." And on top of the pink tub was the receipt from the Glenway Avenue Kroger dated July 31, 2019, and time-stamped 2:18 p.m. that had been in Epperson's wallet when Lushin opened it.

{¶ 84} In the back seat, Pham found additional items, including a leather binder, a tub full of various items, an orange fanny pack, loose change on the floorboard, and some books. In the rear compartment were plastic bags containing clothing and two plastic tubs filled with various items. One of the plastic tubs contained a laundry-detergent container full of coins. A GPS unit was also found in the car.

{¶ 85} Pham then explained that he processed numerous items from the Honda CR-V at the lab, including the backpack from the front passenger seat. Inside the backpack were a set of keys that included a key to Epperson's apartment, a wallet with numerous cards bearing Roberts's name, and a book, *The Egyptian Cat Mystery*, containing an envelope marking a specific page in the book. The illustration on that page is of a man lying on the ground on his back and another man standing over him strangling him with his bare hands.

{¶ 86} Pham also testified that based on the contents of the wallet from the backpack, it was clear that the wallet belonged to Roberts. The leather binder and orange fanny pack that were found in the back seat were also processed and their contents photographed. In the orange fanny pack was a debit card in Roberts's name with an account number ending in 0721 (as noted above, a receipt from a Food Mart in Gaffney, South Carolina, dated July 30, 2019, time-stamped 7:24, and indicating that the customer paid with a card bearing an account number ending in 0721 was found in Williams's Honda Pilot). On the front passenger seat of the Honda CR-V was Roberts's South Carolina state identification card. The wallet Pham found on the front passenger seat contained Epperson's Ohio driver's license, money, several cards bearing Epperson's name, and various receipts and notes.

{¶ 87} Next, Dr. Jennifer Schott, a deputy coroner and forensic pathologist for the Hamilton County Coroner's Office, testified that she found a ligature furrow on the front of the neck, a three-inch contusion on the chin, abrasions at the front of the neck, multiple bilateral conjunctival hemorrhages in both eyeballs, a two-inch abrasion on the outside of the right forearm, two abrasions on the right elbow, a one-and-one-half-inch contusion on the inside of the right forearm, and a contusion on the inside of the left elbow. Schott explained that a furrow is something commonly seen in ligature-strangulation cases. She said, "[I]n this case it is kind of a groove in the skin . . . [and it is] very sharp lined on the lower edge of the groove, and it [goes] across, horizontally across, the front of the neck." There were no injuries on the hands. On the lower extremities, Schott found a several two-inch contusions on the front of the right thigh and two scabs on the right knee.

{¶ 88} At the conclusion of the external exam, Schott began the internal examination of the body. She found intramuscular hemorrhages in the back of the neck. According to Schott, this type of injury is commonly found in strangulation cases.

{¶ 89} In her expert medical opinion, "based on a reasonable degree of medical certainty," the cause of Epperson's death was strangulation and the manner of death was homicide. Schott explained that asphyxial deaths typically take a few minutes and that they result from "compression of the neck [and] can involve either compression of just the jugular veins or compression of the carotid arteries or a compression of the airway itself."

{¶ 90} Next, Forensic Scientist William Ralph Harry from the Hamilton County Coroner's Crime Laboratory testified. He explained that the crime lab is broken into specialized areas including forensic biology, drug chemistry, firearms, toxicology, and trace evidence. There are also different levels of experience: Forensic Scientist I (one to five years of experience), Forensic Scientist II (five to ten years of experience), and Forensic Scientist III (ten or more years of experience). Harry is a Forensic Scientist III in the area of forensic biology and is a DNA analyst.

{¶ 91} Harry testified that DNA can be found in any nucleated cell in the body. He also explained that a person's DNA may be left on an object that the person touches ("touch DNA" or "contact DNA") because the person may leave behind skin cells and because secretions—oil and such—from a person's hands can have trace amounts of DNA in them. Whether touch DNA is left on an item depends on a variety of factors, such as how long the person touches that item, whether the object is smooth or rough, and whether the person is sweating.

{¶ 92} Harry next explained that when a DNA test is run, there is "a series of controls throughout the entire process." And one test that is run is a "positive control" test, which is when a known DNA profile is tested to ensure that the results obtained from the testing are accurate. Additionally, Harry testified that when evidence is brought to the crime laboratory, it is given a bar code, assigned a case number, and stored in a secured area that requires a key card to access.

{¶ 93} Harry next explained that there are four basic steps in DNA analysis. The first step is extraction, in which the sample is placed in a tube with chemicals and heated until the DNA is released into the solution. The solution is then purified, leaving just the "purified DNA extract." In the second step, the analyst determines how much DNA there is in the sample. Once the amount of DNA is known, the third step is to run a polymerase chain reaction, which takes a very small amount of DNA and makes millions of copies, resulting in an "amplified product." In the final step, the amplified product is run through an instrument that produces a visual DNA profile. Once the profile is created, Harry explained, the analyst "can make interpretations off of it. . . . [But] that doesn't mean you can make a comparison to it." He said the analysts receive a lot of DNA profiles that they "can't do anything with."

{¶ 94} Harry then explained that a DNA profile is a "visual representation" of DNA segments; some segments all people share, but the analysts are interested in the segments called "short tandem repeats" because the number of short tandem repeats varies. Putting it in layman's terms, Harry said that a DNA profile boils down to a series of numbers, and the numbers obtained from the unknown DNA sample are compared to the numbers from the DNA from a known individual to see whether they match.

{¶ 95} Harry next explained that some samples that the lab receives contain DNA from multiple people. These samples will result in a mixture of DNA profiles. With these samples, the lab can sometimes determine the source of the major contributor to the sample and the minor contributors, but other times, there is not enough DNA from the minor contributors to make comparisons to the DNA of known individuals.

{¶ 96} Harry identified the crime-lab report for the Epperson homicide. He said that the lab had received Roberts's buccal swabs, i.e., swabs used to collect samples from the inside of Roberts's cheek, and blood that had been collected from

Epperson during the autopsy. The six swabs containing samples collected from Epperson's apartment and the four swabs containing samples collected from the Honda Pilot were submitted by the Cincinnati Police Department for comparison to the known samples.

{¶ 97} Swabs 4-1, 4-2, 4-3, 4-4, 4-5, and 4-6 contained samples collected from Epperson's apartment.

{¶ 98} Swab 4-1 was collected from the bag that had been placed over Epperson's head. That swab contained a single partial DNA profile that matched Epperson's DNA profile.

{¶ 99} Swab 4-2 was collected from the box of trash bags found under Epperson's kitchen sink. That swab contained a single partial DNA profile that matched Epperson.

{¶ 100} Swab 4-3 was collected from the interior doorknob of Epperson's apartment. That swab contained a mixture of DNA from at least two people. The major contributor of DNA was Epperson. The minor contributor of DNA could not be determined because there was not enough DNA to use for comparison purposes.

{¶ 101} Swab 4-4 was collected from the exterior door handle of the apartment's sliding door (which opened onto a balcony). There was insufficient DNA material on that swab to produce a DNA result.

{¶ 102} Swab 4-5 was collected from the interior door handle of the apartment's sliding door. That swab contained a partial DNA profile that was a mixture of DNA from two individuals. The major contributor of DNA was Epperson. The minor contributor of DNA could not be determined because there was not enough DNA to use for comparison purposes.

{¶ 103} Swab 4-6 was collected from the apartment kitchen cabinet doors. There was insufficient DNA material on that swab to produce a DNA result.

{¶ 104} Swabs 5-1, 5-2, 5-3, and 5-4 contained samples collected from Williams's Honda Pilot.

{¶ 105} Swab 5-1 was collected from the ignition key. There was insufficient DNA material on that swab to produce a DNA result.

{¶ 106} Swab 5-2 was collected from the steering wheel. That swab contained a partial DNA profile that matched Roberts's DNA profile.

{¶ 107} Swab 5-3 was collected from the driver's side exterior door handle. That swab contained a partial DNA profile that matched Roberts's DNA profile.

{¶ 108} Swab 5-4 was collected from the driver's side interior door handle. That swab contained a partial DNA profile that matched Roberts's DNA profile.

{¶ 109} There was also a metal electronic smoking device recovered from the Honda Pilot. That device was determined to contain a partial DNA profile that matched Roberts's DNA profile.

{¶ 110} The last item tested for DNA was the purse strap that had been around Epperson's neck. Samples from two different areas were collected. One set of swabs was used to collect blood that was on the purse strap, and another set of swabs was used to collect samples from the areas that did not contain blood.

{¶ 111} The swabs from both areas gave the same results. The swabs contained a partial DNA profile that was a mixture of DNA from two individuals. The major contributor of DNA was Epperson. The minor contributor of DNA could not be determined because there was not enough DNA to use for comparison purposes.

{¶ 112} The State's final witness was the lead detective in the case, Homicide Detective Kelley. Kelley testified that she and her partner, Detective Ballman, arrived and spoke with the initial responding officers. After viewing the apartment, the detectives did a preliminary canvas for available video or witnesses and then focused on the area of the apartment where Epperson was found. The paramedics had already come and gone by the time the detectives arrived, and the coroner arrived while the detectives were there. Criminalists Lane and Foote were also in the apartment while the detectives were there.

{¶ 113} Kelley explained that when she arrives on the scene of a crime, she likes to walk around the scene herself and "observe what's there, maybe what's not there." She then explained that when criminalists arrive at a crime scene, they start taking "overall photographs" of the scene and will also take pictures of and collect any items that a detective points out as potentially important.

{¶ 114} Kelley testified that when she stepped inside the door to Epperson's apartment, Epperson's body was over to the right lying face down on the floor in the corner of the dining area. The body had a plastic trash bag over the head, and a purse strap was sticking out from underneath the plastic bag. Because of the position of the body, Kelley initially could not tell if the strap was around the neck. The dining table and a rug appeared to be out of place, and a dining chair was broken. Kroger bags with groceries in them were on the floor around and underneath Epperson, and there were smashed blueberries and tomatoes on the floor. Kelley said that the rest of the apartment looked "lived in" but that there were no signs of a struggle in any other area of the apartment.

{¶ 115} When asked about the Jimmy John's bag, Kelley testified that she saw the Jimmy John's bag inside a Kroger bag lying near Epperson's body. Kelley pointed it out to Lane, who then photographed it in place and then placed it on the table to take a closer photograph of the bag and the receipt.

{¶ 116} Kelley's supervisor arrived on the scene and advised the detectives that the previous day, a deputy on patrol in Indiana had stopped to see if the driver of a car that was pulled off on the side of a road needed assistance. They were told that the car belonged to Epperson, that the driver (Roberts) had lied about his identity and had acted suspiciously, and that Epperson's wallet containing her driver's license, credit cards, and money had been in the car. Kelley testified that she had noticed that the purse on the dining table in Epperson's apartment contained a phone charger, cellphone, and some keys, but it did not contain a wallet.

{¶ 117} Kelley then contacted Lushin, was told about his interaction with Roberts, and obtained and watched the body-worn-camera video of the interaction. The video shows Roberts telling Lushin that he had his mother's permission to use the Honda CR-V, that he was traveling to Wisconsin, and that when he last saw his mother, she was taking her groceries into her apartment building.

{¶ 118} During the investigation, Kelley learned that Roberts had been staying with Williams in Augusta and that between 9:30 p.m. and 11:00 p.m. on July 29, Roberts had taken Williams's Honda Pilot without permission. The Honda Pilot was found in the parking lot adjacent to Epperson's apartment building on August 1 and was towed to the Cincinnati Police Department garage for processing.

{¶ 119} Kelley noticed that there were a lot of Roberts's personal items in the Honda Pilot and that there was also what looked like an orange plastic lid to a Tide Pod laundry-detergent container in the car. That orange lid, Kelley explained, was significant because an orange Tide Pod container full of change and missing a lid had been found in Epperson's Honda CR-V.

{¶ 120} Other items of significance found in the Honda Pilot were receipts and personal papers. Those receipts helped establish a timeline of when Roberts left Augusta and arrived in Cincinnati. Kelley testified that the receipts established that at 7:24 on July 30, 2019, Roberts was at a Food Mart in Gaffney, South Carolina; at 9:25 a.m. on July 30, he was at an Exxon gas station in Connelly Springs, North Carolina; and at 9:52 p.m. on July 30, he was at the Glenway Avenue McDonald's restaurant—less than two miles from Epperson's apartment. Kelley identified a screenshot that she took of the McDonald's video depicting Roberts standing at the front counter of the McDonald's at the time matching the receipt.

{¶ 121} Next, Kelley explained that on the morning of July 31, Epperson took a personal day and did not go to work. Kelley testified that Epperson's supervisor said that that was unusual for Epperson. Based on evidence found in the apartment, Kelley believed that Epperson had been attempting to locate Roberts.

{¶ 122} Kelley testified that on the first page of the clipboard in Epperson's apartment were notes on how to locate a phone with "findmymobilesamsung.com," along with Roberts's email address and password. Kelley then explained that because Roberts had reset his cellphone, there were no numbers stored in it and the criminalists were unable to download any information from it.

{¶ 123} The second page of Epperson's notes on the clipboard showed that she was attempting to locate Roberts in Augusta on the morning of July 31. The notes indicate that Augusta is in Richmond County, Georgia, and that Epperson contacted the Richmond County Jail at 9:15 a.m. on July 31. Under that information, she had written, "No Elijah Roberts there." Next, the notes show that Epperson called University Hospital in Augusta at 9:20 a.m. and made the notation "not there." Epperson's notes then indicate that she called three other Augusta-area hospitals, and next to two of the hospitals, she had written "not there," and next to the third, she had written, "could not disclose if he's there due to HIPAA."

{¶ 124} Kelley then identified the surveillance video she had obtained from the Kroger on Glenway Avenue, and it was played for the jury. The video shows that on the afternoon of July 31, Epperson entered the Kroger wearing glasses, a gray t-shirt, black-and-white athletic shorts, white gym shoes, and a white long-strapped purse across her body. Those are the same clothes Epperson was wearing when she was found dead in her apartment on August 1. Surveillance video shows that after purchasing her groceries at 2:18 p.m., Epperson returned her wallet to her purse, zipped the purse closed, and left Kroger wearing the long-strapped white purse across her body. Kelley noted that what was significant about the Kroger surveillance video was that it showed that Epperson had been using her purse to carry her wallet; she had not been carrying it in her hand. And when Epperson's body was found, her white purse was on the dining table with the center compartment open, the outer compartments zipped closed, and the strap was detached from the purse and was around Epperson's neck. There was no wallet in

the purse, and Epperson's wallet was found in her Honda CR-V, which Roberts was driving in Indiana on July 31 at 7:00 p.m.

{¶ 125} Kelley next explained that upon leaving Kroger, Epperson went to the Glenway Avenue Jimmy John's, approximately one mile from Kroger, and purchased a sandwich and a bag of chips at 2:31 p.m. Kelley also explained that the Jimmy John's receipt was significant timeline evidence because it showed that Epperson was alive at that time.

{¶ 126} Kelley then was asked in how many of the 70 homicide cases she had investigated had DNA or fingerprints been recovered from the crime scene. She said that in her experience, it is rare to recover DNA or fingerprints from a crime scene and that typically, electronic evidence from videos, phones, and social media is more likely to be used as evidence.

{¶ 127} On cross-examination, Kelley identified an Ohio Bureau of Motor Vehicles record-request form that was in the backpack that was found in Epperson's Honda CR-V. Roberts had signed the form on July 20, 2019, but the email address listed was EliBlainew@gmail.com—an email address that was different from the one that Epperson had written in her notes in connection with her attempts to locate him through his cellphone-service provider. Kelley then identified a photograph of several documents of Roberts's that had been recovered from the Honda CR-V, including a driving abstract, a birth certificate, and a Social Security card. Also recovered were two envelopes with Roberts's full name on them. On each envelope, "Roberts" had been crossed out and "Blaine" had been written in its place.

### C. Conviction and Sentence

{¶ 128} The jury found Roberts guilty on both counts of aggravated murder and one count each of aggravated robbery and tampering with evidence. Additionally, the trial court found Roberts guilty of one count of receiving solen property, which had been tried to the bench. For sentencing purposes, the trial court

merged both the R.C. 2903.01(B) aggravated-murder count and the aggravated-robbery count with the R.C. 2903.01(A) aggravated-murder count, i.e., aggravated murder with prior calculation and design, and imposed life imprisonment with parole eligibility after 25 years. The court imposed a term of 36 months for the tampering-with-evidence count and 18 months for the receiving-stolen-property count and ordered that all the sentences be served concurrently.

*D. Appeals*

{¶ 129} Roberts appealed to the First District, raising six assignments of error. *See* 2024-Ohio-1604 at ¶ 1 (1st Dist.). Relevant here are assignment of error Nos. 1 and 2. The first assignment of error challenged the trial court's denial of Roberts's motion to suppress the statements he made to Deputy Lushin; Roberts argued that the roadside encounter had almost immediately become a custodial interrogation and he had not been read his *Miranda* rights. Roberts's second assignment of error argued that the trial court improperly admitted Williams's other-acts testimony under Evid.R. 404(B). Specifically, Roberts sought to exclude Williams's testimony that he stole her Honda Pilot and that she observed her dining-room curtains smoldering around the time of Roberts's departure.

{¶ 130} The court of appeals held that the trial court had erred by admitting Roberts's statements after the 15:59 minute mark of the video from Lushin's body-worn camera and by admitting Williams's testimony regarding Roberts's other acts. *Id*. at ¶ 56-57, 71-88. It concluded that these errors were not harmless, because after it excised the erroneously admitted evidence, it determined that his convictions for aggravated murder, aggravated robbery, and tampering with evidence were not supported by overwhelming evidence of guilt. *Id.* at ¶ 58-59, 90. In support of its conclusion, the court cited inconclusive DNA evidence and the lack of testing of Epperson's fingernail clippings. *Id.* at ¶ 58. It also noted Roberts's familial relationship with Epperson and the lack of testimony that he did not have legitimate access to her wallet, keys, and car. *Id*. As a result, the First

District reversed Roberts's convictions for aggravated murder and aggravated robbery and remanded the cause to the trial court for a new trial on those counts. *Id.* at ¶ 61, 90, 114. The court also reversed Roberts's conviction for tampering with evidence and held that the lack of sufficient evidence barred retrial on that count. *Id.* at ¶ 113-114.

{¶ 131} The State appealed to this court, and we accepted the appeal on the State's single proposition of law: "Where there is overwhelming evidence of guilt, a reviewing court errs as a matter of law by failing to find harmless the admission of isolated statements and prior acts of the defendant. The remaining evidence, standing alone, constituted overwhelming proof of Roberts's guilt." *See* 2024-Ohio-3096. The State's proposition of law is worded broadly; however, the State's appeal is limited by its merit brief, which asks this court to reverse only the appellate court's reversal of Roberts's convictions for aggravated murder and aggravated robbery.

### III. LAW AND ANALYSIS

{¶ 132} As a threshold matter, we address Roberts's contention that the State forfeited its harmless-error argument by failing to raise it below. We disagree.

{¶ 133} The State was not required to argue harmless error before the court of appeals for that court to engage in the harmless-error analysis, because under the Rules of Criminal Procedure, specifically Crim.R. 52(A), a court of appeals is required to engage in a harmless-error analysis when, as in this case, a defendant appeals his conviction on the basis of trial-court errors to which he objected at trial. *State v. Perry*, 2004-Ohio-297, ¶ 15. As this court explained in *Perry*, "Crim.R. 52(A) is mandatory, not permissive, and thus affords the appellate court no discretion to disregard [such an] error." *Id.* But if the error "does not affect substantial rights[, it] *shall* be disregarded." (Emphasis added.) Crim.R. 52(A). The court of appeals conducted the harmless-error review required by the rule, and the State has presented a proposition of law challenging the appellate court's

determination that the error was not harmless. Accordingly, the State has not forfeited its argument.

*A. Standard of Review*

{¶ 134} "The harmless-error doctrine recognizes the principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence . . . and promotes public respect for the criminal process by focusing on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error." *Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986).

{¶ 135} The harmless-error doctrine is reflected in Crim.R. 52(A), which states: "Harmless Error. Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded." "Under [Crim.R. 52(A)], the *government* bears the burden of demonstrating that the error did not affect the substantial rights of the defendant." (Emphasis in original.) *Perry* at ¶ 15. "An appellate court must reverse a conviction if the government does not satisfy this burden." *Id.*

{¶ 136} When a defendant objects to a constitutional error at trial, the error is a reversible error unless the State establishes beyond a reasonable doubt that the error complained of did not contribute to the conviction. *Chapman v. California*, 386 U.S. 18, 24 (1967). In contrast, this court has indicated that "[n]onconstitutional error is harmless if there is substantial other evidence to support the guilty verdict." *State v. Webb*, 1994-Ohio-425, ¶ 54.

{¶ 137} In *State v. Morris*, 2014-Ohio-5052, however, a sharply divided court dispensed with the distinction between harmless-error review for constitutional errors and harmless-error review for nonconstitutional errors. *Id*. at ¶ 22-24. The majority in *Morris* held that the beyond-a-reasonable-doubt harmless-

error standard applied to both constitutional and nonconstitutional errors that had been preserved.[1] *Id.*

{¶ 138} The *Morris* court created a three-part test for courts to apply in reviewing for harmless error:

> First, it must be determined whether the defendant was prejudiced by the error, i.e., whether the error had an impact on the verdict. Second, it must be determined whether the error was not harmless beyond a reasonable doubt. Lastly, once the prejudicial evidence is excised, the remaining evidence is weighed to determine whether it establishes the defendant's guilt beyond a reasonable doubt.

(Citations omitted.) *State v. Harris*, 2015-Ohio-166, ¶ 37, citing *Morris* at ¶ 25, 27-29, 33. This court has recognized that an error in admitting evidence may be deemed harmless beyond a reasonable doubt if when the improperly admitted evidence is excised, the remaining evidence provides overwhelming proof of the defendant's guilt. *Morris* at ¶ 32. "[A constitutional] error in a criminal case in which the defendant is convicted by a jury is harmless if without the error no

---

1. The author of this opinion disagreed with this court's merging of the harmless-error standard of review applied in cases involving constitutional errors and the harmless-error standard of review applied in cases involving nonconstitutional errors and would have applied the harmless-error standard that federal circuit courts apply in cases involving nonconstitutional errors. *Morris* at ¶ 55 (Kennedy, J., dissenting). That standard requires a court to determine whether the judgment was substantially swayed by the improperly admitted evidence. *Id.* (Kennedy, J., dissenting), citing *Kotteakos v. United States*, 328 U.S. 750, 765 (1946). Former Justice Terrence O'Donnell contended that the preponderance standard should apply when deciding whether a nonconstitutional error affected the outcome of the trial and that the beyond-a-reasonable-doubt standard should apply when deciding whether a constitutional error affected the outcome of the trial. *Morris* at ¶ 43 (O'Donnell, J., dissenting). Our decision today, which relies on the factors enunciated in *Morris*, does not foreclose future parties from arguing that a different harmless-error standard should apply in cases involving nonconstitutional errors.

*reasonable* juror would have voted to acquit." (Emphasis in original.) *United States v. Williams*, 698 F.3d 374, 383 (7th Cir. 2012).

{¶ 139} "[P]roof of guilt may be made by circumstantial evidence as well as by real evidence and direct or testimonial evidence, or any combination of these three classes of evidence." 1A Wigmore, *Evidence*, § 24 et seq., at 944 (Tillers Rev. 1983)*.* "Circumstantial evidence and direct evidence inherently possess the same probative value . . . ." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph one of the syllabus, *superseded by constitutional amendment on other grounds as stated in State v. Smith*, 1997-Ohio-355, ¶ 49, fn. 4.

{¶ 140} "Circumstantial evidence is sometimes defined as proof of facts by direct evidence from which the trier of fact may infer or derive by reasoning other facts in accordance with the common experience of mankind." *State v. Griffin*, 13 Ohio App.3d 376, 377 (1st Dist. 1979), citing 1 *Ohio Jury Instructions*, § 5.10d (1968). When reviewing the evidence presented, it is within the province of the fact-finder to draw reasonable inferences from the evidence. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). And when drawing reasonable inferences, jurors are "free to rely on their common sense and experience." *State v. Allen*, 1995-Ohio-283, ¶ 45. "'[C]ircumstantial evidence is sufficient to sustain a conviction if that evidence would convince the average mind of the defendant's guilt beyond a reasonable doubt.'" *State v. McKnight*, 2005-Ohio-6046, ¶ 75, quoting *State v. Heinish*, 50 Ohio St.3d 231, 238 (1990).

{¶ 141} In this case, the State relied primarily on circumstantial evidence—there is no direct evidence of guilt such as a confession or an eyewitness.

{¶ 142} The State has not challenged the court of appeals' holding that the trial court erred in denying Roberts's motion to suppress his statements made after the 15:59 minute mark of the video from Deputy Lushin's body-worn camera or that the trial court erred in denying Roberts's motion in limine to exclude Williams's other-acts testimony. The State's appeal is narrow. It focuses on only

the third part of the *Morris* test: whether, once the improperly admitted evidence is excised, the remaining evidence establishes the defendant's guilt beyond a reasonable doubt. *See Morris*, 2014-Ohio-5052, at ¶ 29. We hold that the third part of the test is satisfied in this case; after excising the improperly admitted evidence there remains overwhelming evidence of Roberts's guilt of aggravated murder and aggravated robbery. The trial court's evidentiary errors were harmless beyond a reasonable doubt.

*B. The Remaining Evidence Proves Roberts's Guilt Beyond a Reasonable Doubt*

**1. Aggravated Murder under R.C. 2903.01(A)**

**{¶ 143}** For Roberts to be convicted of aggravated murder under R.C. 2903.01(A), the State was required to prove beyond a reasonable doubt that Roberts "purposely, and with prior calculation and design" caused Epperson's death. R.C. 2903.01(A). A person acts purposely "when it is the person's specific intention to cause a certain result." R.C. 2901.22(A).

**{¶ 144}** "The phrase 'prior calculation and design' by its own terms suggests advance reasoning to formulate the purpose to kill." *State v. Walker*, 2016-Ohio-8295, ¶ 18. As this court explained in *State v. Maxwell*, 2014-Ohio-1019,

> [n]o bright-line test exists that "emphatically distinguishes between the presence or absence of 'prior calculation and design.' Instead, each case turns on the particular facts and evidence presented at trial."

*Id.* at ¶ 148, quoting *State v. Taylor*, 1997-Ohio-243, ¶ 28.

**{¶ 145}** "[I]nstantaneous deliberation is not sufficient to constitute 'prior calculation and design.'" *State v. Cotton*, 56 Ohio St.2d 8, 11 (1978). But this does not mean that a considerable amount of time must lapse between formulating the

plan and committing the murder. "[P]rior calculation and design can be found even when the killer quickly conceived and executed the plan to kill within a few minutes," *State v. Coley*, 2001-Ohio-1340, ¶ 59, or when the evidence shows that the killer "went beyond a momentary impulse and show[s] that he was determined to complete a specific course of action," *State v. Conway*, 2006-Ohio-791, ¶ 46. Even the "nature of the attack" can show prior calculation and design. *State v. Cassano*, 2002-Ohio-3751, ¶ 81.

{¶ 146} The question is whether "'[the] defendant acted with advance reasoning and purpose to kill.'" (Bracketed text added in *Nicholson*.) *State v. Nicholson*, 2024-Ohio-604, ¶ 51, quoting *State v. Jones*, 2021-Ohio-3311, ¶ 2 (lead opinion). And when the evidence presented at trial "reveals the presence of sufficient time and opportunity for the planning of an act of homicide to constitute prior calculation, and the circumstances surrounding the homicide show a scheme designed to implement the calculated decision to kill, a finding by the trier of fact of prior calculation and design is justified." *Cotton* at paragraph three of the syllabus.

{¶ 147} In *State v. Franklin*, 2002-Ohio-5304, this court reiterated that there are three "pertinent" considerations in determining whether prior calculation and design exist: "'(1) Did the accused and victim know each other, and if so, was that relationship strained? (2) Did the accused give thought or preparation to choosing the murder weapon or murder site? and (3) Was the act drawn out or "an almost instantaneous eruption of events?"'" *Id.* at ¶ 56, quoting *Taylor*, 1997-Ohio-243, at ¶ 25, quoting *State v. Jenkins*, 48 Ohio App.2d 99, 102 (8th Dist. 1976). While this court has stated that these considerations are "pertinent," we have "never held that these are the *exclusive* factors to be applied in determining whether the accused acted with prior calculation and design." (Emphasis in original). *State v. Walker*, 2016-Ohio-8295, ¶ 40 (O'Donnell, J., dissenting).

{¶ 148} At oral argument, Roberts asserted that when the improperly admitted custodial statements are excised, there is not overwhelming evidence that places Roberts near Epperson at the time of her death. We disagree.

a. Opportunity

{¶ 149} There is overwhelming evidence that places Roberts near Epperson at the time of her death and establishes that he murdered her.

{¶ 150} First, Roberts was in possession of Epperson's wallet, which she clearly had possession of at the time of her death. Epperson shopped at the Glenway Avenue Kroger in the afternoon of July 31, 2019, and checked out at 2:18 p.m. Surveillance video shows that after paying for her groceries, Epperson placed her wallet in the center compartment of her purse. That wallet was later found in the center console of Epperson's Honda CR-V in Indiana with Roberts. When Deputy Lushin opened the wallet while searching the Honda CR-V, his body-worn-camera video shows, the Kroger receipt was in the center compartment of the wallet.

{¶ 151} Next, evidence adduced by the State shows that when Epperson left Kroger, she went to Jimmy John's and purchased a meal for herself at 2:31 p.m. with cash. Because Epperson placed her wallet in her purse before she left Kroger, a jury could reasonably infer that she did the same after she paid for her food at Jimmy John's. And there is no evidence that Epperson went anywhere after Jimmy John's on July 31 before she went home. Importantly, the meal from Jimmy John's was still in the bag of groceries when she was killed, which permits a fact-finder to draw the reasonable inference that she drove straight home from Jimmy John's.

{¶ 152} Lushin testified that his contact with Roberts in Indiana began on July 31 at 7:00 p.m. And according to Lushin, Tipton, Indiana, is approximately a two-and-a-half-hour drive from Cincinnati. So, with Epperson's wallet containing the July 31 Kroger receipt in the center console of the Honda CR-V and with the Jimmy John's receipt showing that Epperson purchased her meal at 2:31 p.m., Roberts's contact with Epperson occurred on July 31 sometime between 2:31 p.m.

(the time Epperson was at Jimmy John's) and 4:30 p.m. (the latest time Roberts could have left Cincinnati in order to be where Lushin saw him in Tipton, Indiana, at 7:00 p.m.). Therefore, Roberts had contact with Epperson on July 31 *after* 2:31 p.m. but *before* 4:30 p.m.

{¶ 153} Further, it is clear from the crime-scene photos that Epperson was violently attacked immediately after entering her apartment, because she had not even had time to set her groceries down. The groceries were in their bags, and the bags were strewn across the floor, with some of the groceries pinned under Epperson's body. And her meal from Jimmy John's was still inside a Kroger bag with groceries, which, again, permits a fact-finder to infer that she drove directly to her apartment from the sandwich store. Epperson's purse, however, was on top of the dining table and the center compartment was unzipped. And the wallet she had placed in her purse at Kroger was missing. It is obvious that the killer had taken the wallet, and Roberts had the wallet when he was detained.

{¶ 154} Second, Williams's Honda Pilot was found in the parking lot adjacent to Epperson's apartment building. Williams testified that she had seen Roberts drive away in her Honda Pilot on July 29, and his belongings and DNA were found in the car.

{¶ 155} A debit card of Roberts was also found in the center console of the Honda Pilot, and a suitcase containing his clothing was in the back seat. When the contents of the suitcase and the center console were processed, receipts from stops in North and South Carolina were found. The last four digits of the card number recorded on the convenience-store receipt from Gaffney, South Carolina—0721— were the same last four digits as one of Roberts's debit cards that Criminalist Pham found in the orange fanny pack in Epperson's Honda CR-V.

{¶ 156} Third, Roberts never told Epperson that he was in Cincinnati. The McDonald's receipt recovered from Williams's Honda Pilot and the McDonald's surveillance video show that Roberts was less than two miles away from

Epperson's apartment on the evening of July 30. Yet on the morning of July 31, Epperson contacted the Richmond County Jail and four Augusta-area hospitals attempting to locate Roberts. Unquestionably, on the day she was murdered, Epperson was under the mistaken belief that Roberts was still in the Augusta area. She did not know that Roberts was in Cincinnati.

{¶ 157} Fourth, when Lushin spoke with Roberts, he was visibly nervous, and Roberts lied about his name and his age. His statement that he was traveling to Wisconsin was not credible given that he had no luggage, he was not on a route that one would take from Cincinnati to Wisconsin, and he was unable to tell Lushin where in Wisconsin he was going. Flight from the scene of a crime and the assumption of a false name both show consciousness of guilt and provide evidence of guilt itself. *State v. Echols*, 2024-Ohio-5088, ¶ 32, citing *State v. Eaton*, 19 Ohio St.2d 145, 160 (1969), *vacated in part on other grounds sub nom. Eaton v. Ohio*, 408 U.S. 935 (1972). All of this serves to prove beyond a reasonable doubt that Roberts killed Epperson.

{¶ 158} Contrary to Roberts's assertion, there is overwhelming evidence that places him near Epperson at the time of her death, giving him the opportunity to murder her.

b. Acted purposely

{¶ 159} As noted above, for Roberts to be convicted of aggravated murder, the State had to prove that he purposely caused Epperson's death. *See* R.C. 2903.01(A). Circumstantial evidence may establish that a defendant acted purposely. *See State v. Nicely*, 39 Ohio St.3d 147, 151 (1988). "The law has long recognized that intent, lying as it does within the privacy of a person's own thoughts, is not susceptible of objective proof." *State v. Garner*, 1995-Ohio-168, ¶ 41. Therefore, surrounding facts and circumstances in the case may establish intent. *Id.*

{¶ 160} In this case, there is overwhelming evidence that Roberts purposely caused the death of Epperson.

{¶ 161} That Roberts acted purposefully is apparent from the nature of the attack. Epperson was ambushed. And Epperson's death was caused by strangulation after Roberts either lay in wait for her in her apartment or followed her into the apartment. Epperson entered her apartment carrying her groceries and did not have time to set her groceries down before she was knocked down with enough force to cause the chair that she struck to break apart—parts of the chair, Epperson's glasses, and spilled groceries were pinned underneath her body.

{¶ 162} Additionally, a jury could reasonably infer that while Epperson was lying face down on the floor, Roberts took the time either to unclip both ends of the strap of Epperson's purse and place the strap around her neck or to remove the purse from around her body and place the strap around her neck. Either way, he applied enough force to the strap for a long enough time to strangle her until she died of asphyxia. According to Dr. Schott—based on a reasonable degree of medical certainty—the cause of Epperson's death was strangulation. Death occurred within a few minutes. The pressure Roberts applied to the strap of the purse caused a furrow in the front of Epperson's neck and intramuscular hemorrhages in the back of her neck.

{¶ 163} Roberts's acts of violently attacking Epperson, strangling her, and applying enough force for a long enough time to cause death is overwhelming evidence that he acted with purpose to cause Epperson's death.

c. Prior calculation and design

{¶ 164} As noted above, for Roberts to be convicted of aggravated murder under R.C. 2903.01(A), the State had to prove that he acted with prior calculation and design, and pertinent to our consideration in determining whether Roberts acted with prior calculation and design are (1) the relationship between Roberts and Epperson, (2) whether Roberts gave thought or preparation to choosing the murder

weapon or murder site, and (3) whether the act was drawn out, *see Franklin*, 2002-Ohio-5304, at ¶ 56.

### i. The relationship between the accused and the victim

{¶ 165} There is overwhelming evidence that the relationship between Roberts and Epperson was strained.

{¶ 166} Roberts and Epperson were not strangers—Epperson was Roberts's mother. But no witness who testified at trial knew the exact nature of their relationship. And based on the totality of the evidence, a jury could infer that Roberts's relationship with Epperson was strained.

{¶ 167} Roberts was having problems with some of his family members, so he went to live with his paternal aunt in Augusta in June 2019. Whether Epperson was one of the family members Roberts was having problems with is unknown, but it is telling that he moved in with his aunt instead of with Epperson.

{¶ 168} Williams believed that Epperson and Roberts had a close, loving relationship. But she based that opinion on the facts that Epperson spoke to her son on the phone every week, paid his cellphone bill, paid his rent for an apartment in which he no longer lived, and sent him money every week. When pressed about Epperson and Roberts's relationship, however, Williams admitted that she could only say what she had seen. She did not know the inner workings of that relationship or even whether Epperson had always been present in Roberts's life. What Williams did know is that in the days before the murder, when Epperson learned that Roberts had left Williams's home, Epperson became very concerned. In fact, Epperson was apparently so concerned that she uncharacteristically took a personal day off work on July 31.

{¶ 169} Further, evidence shows that Roberts left Augusta on July 29 and did not tell his mother that he was leaving Georgia or that he was going to Ohio. It is clear that he did not tell his mother, because, according to Williams, she and Epperson were in contact "every day, all day" on July 29 and 30 while they were

trying to locate Roberts. And it is also clear that Roberts did not contact his mother on the evening of July 30 to let her know that he was at a McDonald's less than two miles from her apartment, because on the morning of July 31, Epperson called the Richmond County (Georgia) Jail and four Augusta-area hospitals trying to locate him. Williams testified that she had learned where Roberts was only when she was notified that Epperson had been murdered. Had Epperson known where Roberts was prior to her death, she very likely would have told Williams, given that she knew he had Williams's car and she and Williams had been in contact with each other concerning his whereabouts.

{¶ 170} Moreover, Epperson believed that she had Roberts's correct email address that was tied to Roberts's account with his cellphone-service provider; it was written on the paperwork in her home. She attempted to locate Roberts by tracking his cellphone using the email address that she had in her notes. But Epperson's attempts to locate Roberts were unsuccessful; she had written in her notes that the website "won't show location if phone is powered off or data is turned off." But Epperson made the notation that the cellphone-service provider told her the data was in fact turned on. A jury could reasonably infer that Epperson had tried to locate Roberts using the tracking function of his phone but that Epperson's attempts did not work because Roberts did not want to be located and had in some way changed the settings on the phone or powered the phone off so that it could not be tracked.

{¶ 171} Only two people knew the true nature of Roberts and Epperson's relationship, and one of them is dead and the other is accused of killing her.

{¶ 172} Based on the totality of this evidence, a jury could reasonably infer that Roberts's relationship with his mother was strained. When Roberts was having problems with his family, he did not move in with his mother. Instead, he moved in with his paternal aunt in Augusta, Georgia. And when Epperson learned that Roberts left his aunt's home on July 29, she became very concerned. She

uncharacteristically took a day off work on July 31 and attempted to locate him by calling a jail and hospitals in Augusta and by trying to track his cellphone. But Epperson's attempt to track his cellphone was unsuccessful, most likely because Roberts had changed the settings on the phone or the phone was powered off.

{¶ 173} Moreover, when Roberts left Augusta and was on his way to Cincinnati, he did not tell Epperson. It can reasonably be inferred that when Roberts was in Cincinnati and less than two miles from Epperson's home, he did not want her to know.

### ii. Thought or preparation in choosing the murder weapon or murder site

{¶ 174} There is overwhelming evidence that Roberts gave thought to how and where he would murder Epperson.

{¶ 175} Regarding the method of murder, Roberts chose strangulation. While processing Epperson's car in Indiana, Criminalist Pham found in Roberts's backpack a book called *The Egyptian Cat Mystery*. A place in the book was marked with an envelope. And the illustration on that page showed a man lying on the ground, on his back, with another man standing over him and strangling him with his bare hands.

{¶ 176} Roberts also chose the nature of the attack. When Epperson entered her apartment, she was violently attacked. Crime-scene photos show that she did not have time to set her groceries down; the groceries were still in their bags and strewn across the floor—some were pinned under Epperson's body. A jury could reasonably infer that once Epperson was face down on the floor, Roberts took the time to unclip both ends of the strap of Epperson's purse, place the strap around her neck, and apply enough pressure to the strap for a long enough time to strangle Epperson to death. Or a jury could reasonably infer that Roberts took the time to remove the purse from around Epperson's body and strangle her with its strap for a long enough time to kill her. Either way, Roberts chose the murder weapon when he intentionally used the strap so as to strangle Epperson with it.

{¶ 177} Roberts also decided where he would murder Epperson. He drove Williams's Honda Pilot from Augusta to Epperson's apartment complex in Cincinnati and parked in the lot adjacent to her apartment building. He had made sure that his phone could not be tracked, either by changing its settings or powering it off, and he did not contact his mother to tell her where he was.

{¶ 178} Additionally, there was no damage to the locks or door of Epperson's apartment. When Criminalist Pham processed Epperson's Honda CR-V in Indiana, he found a key to Epperson's apartment in Roberts's backpack.

{¶ 179} Based on this evidence, a jury could reasonably infer one of three things. One, Roberts let himself into Epperson's apartment and lay in wait for her to come home and attacked her as she entered the apartment. Two, Roberts sat in the Honda Pilot in the lot adjacent to Epperson's apartment building, waited for her to come home, followed her into her apartment as she carried her groceries, and then attacked her. Three, Roberts walked into the apartment with Epperson and attacked her as soon as they stepped inside. Whichever way it may have happened, Roberts chose to murder Epperson in her apartment.

{¶ 180} There is overwhelming evidence that Roberts gave thought in choosing the murder weapon (purse strap) and the site of the murder (Epperson's apartment).

### iii. The act was drawn out

{¶ 181} There is overwhelming evidence that the act was drawn out. There are several reasonable possibilities as to when Roberts conceived of his plan to murder Epperson.

{¶ 182} A jury could reasonably infer that Roberts formed the plan to kill Epperson before he left Augusta. The chain of events that ended in Epperson's death began in Augusta on July 29, 2019, between 9:30 p.m. and 11:00 p.m., when Roberts left in Williams's car. Epperson was last known to be alive when she bought a meal at Jimmy John's at 2:31 p.m. on July 31. She was murdered soon

after she entered her apartment carrying her groceries and the Jimmy John's meal she had just purchased. Assuming this is what the jury determined, the planning stage of the murder lasted more than 40 hours.

{¶ 183} Alternatively, a jury could also reasonably infer that Roberts formed the plan to kill Epperson when he was within two miles of Epperson's apartment on July 30 at 9:52 p.m. Approximately 17 hours elapsed between that time and the time Epperson was murdered.

{¶ 184} The totality of the evidence shows that the murder did not occur as "'"an almost instantaneous eruption of events,"'" *Franklin*, 2002-Ohio-5304, at ¶ 56, quoting *Taylor*, 1997-Ohio-243, at ¶ 25, quoting *Jenkins*, 48 Ohio App.2d at 102 (8th Dist.). What is most significant is the fact that Epperson had not had time to set her groceries down before she was attacked, which establishes that she was attacked as soon as she walked in the door of her apartment. That means that Roberts either (1) let himself into her apartment and lay in wait for her with a plan to kill her or (2) waited in the Honda Pilot in the adjacent parking lot and then followed her into the apartment with a plan to kill her or (3) accompanied her into the apartment with a plan to kill her. All these scenarios indicate that there was a drawn out strategy to kill Epperson that went beyond a momentary impulse.

{¶ 185} Also, the killing itself was drawn out. Epperson was first violently attacked and knocked to the floor. While she was lying face down on the floor, Roberts took the time to either unclip the strap of Epperson's purse or remove the purse from her body and then place the strap around her neck and apply enough force for enough time to strangle Epperson to death. Dr. Schott testified that it would have taken minutes for Epperson to die by strangulation.

{¶ 186} As a result, there is overwhelming evidence that the act was drawn out.

{¶ 187} Therefore, construing the totality of the evidence, there is overwhelming evidence that Roberts acted with prior calculation and design.

### 2. Aggravated Robbery under R.C. 2911.01(A)(3)

{¶ 188} For Roberts to be convicted of aggravated robbery under R.C. 2911.01(A)(3), the State was required to prove beyond a reasonable doubt that Roberts, "in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, . . . [i]nflict[ed], or attempt[ed] to inflict, serious physical harm on another."

{¶ 189} First, Roberts inflicted serious physical harm on Epperson. Epperson was attacked and knocked to the floor. While she was lying face down, Roberts placed the strap of her purse around her neck and applied enough force to the strap for a long enough time to cause her death. The deputy coroner found a ligature furrow on the front of Epperson's neck and multiple bilateral conjunctival hemorrhages in her eyeballs. And according to the deputy coroner, it took minutes for death to occur. As a result, the physical harm inflicted by Roberts on Epperson carried a substantial risk of killing her and, in fact, did kill her.

{¶ 190} Second, after killing Epperson, Roberts took her wallet and fled the scene in her Honda CR-V. He was apprehended later that day in Tipton County, Indiana—two and a half hours away from Cincinnati—with both her car and her wallet.

{¶ 191} A jury could reasonably infer that Roberts attacked and murdered Epperson and stole her property, thereby inflicting serious physical harm while committing a theft offense.

{¶ 192} Consequently, there is overwhelming evidence that Roberts committed aggravated robbery.

### C. The Appellate Court Lost Its Way

{¶ 193} The First District listed three reasons that it said militate against concluding that the admission of Roberts's custodial statements to Lushin and Williams's other-acts testimony was harmless error: (1) the DNA of a person other than Epperson was found in Epperson's apartment, (2) Epperson's fingernails were

not tested for DNA, and (3) Roberts had a familial relationship with Epperson, so he may have had permission to have possession of her wallet, keys, and car, and there was not sufficient evidence to establish that he did not have permission. *See* 2024-Ohio-1604 at ¶ 58-59 (1st Dist.).

{¶ 194} But the third part of the *Morris* test does not ask what is not in evidence. The third part asks whether after "the prejudicial evidence is excised, the remaining evidence" establishes the defendant's guilt beyond a reasonable doubt. *Harris*, 2015-Ohio-166, at ¶ 37, citing *Morris*, 2014-Ohio-5052 at ¶ 29, 33.

{¶ 195} Regarding the court of appeals' first reason listed, Forensic Scientist Harry did not testify that the DNA of someone other than Epperson and Roberts was in Epperson's apartment. Harry testified that some of the swabs from Epperson's apartment contained a mixture of DNA from at least two people, that Epperson was the major contributor of the DNA, and that the minor contributor of DNA could not be determined, because the DNA sample was *too small to test*. Anyone, including Roberts, could be the minor contributor.

{¶ 196} As for the court of appeals' second reason, it does not matter that Epperson's fingernail clippings were not tested for DNA. We ask whether the totality of the evidence, including any reasonable inferences drawn from that evidence, proves that the accused committed the crime beyond a reasonable doubt. And here, given the totality of the remaining evidence that Roberts murdered Epperson, the fact that her fingernail clippings were not tested does not undermine that determination.

{¶ 197} Regarding the court of appeals' third reason—the lack of direct evidence as to whether Roberts had permission to take Epperson's wallet, keys, and car—based on the totality of the evidence, it would be unreasonable to infer that Roberts received permission to take Epperson's wallet, keys, and car immediately before he attacked her and strangled her to death in the entryway of her apartment.

### D. Manifest-Weight Challenge

**{¶ 198}** In the court of appeals, Roberts also assigned as error a claim that his aggravated-murder and aggravated-robbery convictions are against the manifest weight of the evidence. Based on its holding in the case, the court of appeals declared this assignment of error moot and declined to address it. 2024-Ohio-1604 at ¶ 5, 103 (1st Dist.). We need not remand this matter for the court of appeals to review Roberts's manifest-weight challenge. With our decision that the evidence against him without the improperly admitted evidence is overwhelming, it is a foregone conclusion that his convictions for aggravated murder and aggravated robbery are not against the manifest weight of the evidence. Any remand would be a futile exercise.

## IV. CONCLUSION

**{¶ 199}** Based on our review of the record after excising the evidence that the appellate court found was prejudicial and erroneously admitted by the trial court, we conclude that the remaining evidence overwhelmingly proves Roberts's guilt of aggravated murder and aggravated robbery beyond a reasonable doubt. Therefore, his convictions are supported by sufficient evidence and are not against the manifest weight of the evidence. For the foregoing reasons, we reverse the judgment of the First District Court of Appeals and reinstate Roberts's convictions for those crimes.

Judgment reversed

and convictions reinstated.

———————————

Connie Pillich, Hamilton County Prosecuting Attorney, and Philip R. Cummings Jr., and Candace Crear, Assistant Prosecuting Attorneys, for appellant.

Michael J. Trapp, for appellee.

Elizabeth R. Miller, Ohio Public Defender, and Craig M. Jaquith, Assistant Public Defender, urging affirmance for amicus curiae, the Ohio Public Defender.

January Term, 2025

_____